**Roger Dallas ROWBOTHAM, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. F–75–44.**

Court of Criminal Appeals of Oklahoma.
Sept. 18, 1975.

Rehearing Denied Nov. 25, 1975.

T. Jack Graves, Jon D. Douthitt, Claremore, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Jahn D. Rohrer, Legal Intern, for Appellee.

## OPINION

BLISS, Judge:

Appellant, Roger Dallas Rowbotham, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Rogers County, Case No. CRF–74–43, for the offense of Murder, First Degree, in violation of 21 O.S.Supp.1974, § 701.1, ¶ 2. In accordance with the provisions of 21 O.S.Supp.1974, § 701.3, the defendant was thereafter sentenced to suffer death, and from said judgment and sentence a timely appeal has been perfected to this Court.

Mary Rossi testified she was a registered nurse at St. John's Hospital in Tulsa, Oklahoma, and that she was so employed on the 15th of February, 1974, on which day she worked from 6:30 a.m. to 3:00 p. m. She testified that she had known the decedent, Beverly Meeker, as Mrs. Meeker, was also a registered nurse at the same hospital on February 15. She had conversed with the decedent on the morning of February 15 and the decedent appeared to be in good health. Mrs. Meeker had worked the 11:00 p. m. to 7:00 a. m. shift and she left for home at approximately 7:15 a. m. on that morning.

Willie Rowbotham testified that he was the father of the defendant who he had seen on the morning of February 15, at the Verdigris River Bridge on Highway 33. He stated that at approximately 8:00 a. m. on that morning he was driving to Tulsa when he observed the defendant's car parked at the side of the road. Upon stopping, he found the car unattended with the keys in the ignition. He took the keys with him and returned about one hour later finding the defendant sitting in the car at which time he lectured defendant about leaving keys in an unattended car. He further testified that he accompanied the defendant to a nearby service station to call his (defendant's) wife to instruct her that she need not bring him a car key.

George Shirer testified he lived on old Highway 33 approximately one-half mile from the Verdigris River and had resided at that location for about five or six years. On the morning of the 15th of February, 1974, after having breakfast at approximately 8:00 a. m., he and his wife left their house to feed his cattle and upon returning from feeding the cattle he noticed an unoccupied pickup on the northwest side of the highway. He also observed a car parked near the boat ramp very close to the river. Upon investigation he observed a person slumped over the steering wheel and observed blood on the person's arm. Thereafter he notified the authorities.

Paul Kroker testified that on the morning of February 15, 1974, while hauling eggs from Chouteau to Tulsa on Highway 33, he observed a dark green Pontiac and a pickup parked on the side of Highway 33 at the Verdigris River. He observed one individual in the pickup and someone standing beside the car.

Jimmy Williams testified that on the 15th of February, 1974, he was employed in Tulsa and at approximately 8:30 that morning he was in the vicinity of the Verdigris River and Highway 33. He stated that upon crossing the river bridge he observed a man walking up the bank from the river to a green Pontiac with a dark top which was parked on the left side of the highway. Thinking that the man had car trouble, he turned around and returned to the parked car to offer assistance, whereupon the man told him that his father had taken his car keys. He then identified in court the defendant as that individual. He further testified that after offering assistance to the defendant on that morning, he observed the defendant to have, in his hand, a pocket knife which was approximately three to three and one-half inches in length. Upon being shown State's Exhibit No. 1, a pocket knife, he testified said exhibit resembled the knife he had seen in the defendant's hand on that morning.

Benny Dirck testified he was employed as the Deputy Sheriff of Rogers County and had been so employed for approximately five and one-half years. While in that capacity he participated in the investigation of the case, State versus Rowbotham. Upon being shown State's Exhibit No. 2 and No. 3, photographs of footprints, he testified that these photographs had been taken on the 18th of February, 1974, in the area where the decedent's body was found. The photographs were taken in his presence and they accurately depicted the scene on that day. The photographs were then admitted into evidence.

T. J. Smith testified he was employed as Assistant Superintendent for Mid-Con Fabricators for the Port of Catoosa and was so employed on the 15th of February, 1974. He testified that the defendant had been employed with the firm for three to four weeks and his working hours had been from 8:00 a. m. to 5:30 p. m. The firm's procedure for reporting to work consisted of punching a time card. The witness was then shown and identified State's Exhibit No. 4, defendant's time card dated February 15, 1974, which had been punched in at between 10:00 and 10:06 a. m. Thereafter, the card was admitted into evidence.

J. B. Hamby testified he was employed as the Undersheriff of Rogers County and had been so employed intermittently for ten years. While so employed he was in the vicinity of the Verdigris River and Highway 33 on February 15, 1974, at approximately 10:00 a. m. He stated that he went there in response to a call and found Officer Jim Clark already at the scene. He observed a 1970 Chevrolet parked facing the water with a woman inside slumped over, clothed in a brown coat under which she was nude. He observed that the woman's throat was slashed and she had no pulse. A photographer was called who took photographs and thereafter, at approximately 11:30 a. m., the body was taken from the scene to the Health Center in Claremore. Later, the body was taken to the Oklahoma Osteopathic Hospital in Tulsa, Oklahoma, where an autopsy was performed. Upon being shown State's Exhibits No. 5, 6 and 7, photographs of the car in which decedent was found, and two photographs of the decedent as she was found in the car slumped to the left, he stated said photographs accurately and truly represented the scene as depicted therein. Thereafter, said exhibits were admitted into evidence. On the 16th day of February, at approximately 12:40 p. m., he, with the assistance of Sergeant Larry Johnson and Bill Mitchell, Chief Criminal Investi-

gator for Osage County, went to the Port of Catoosa and arrested the defendant on suspicion of murder. Upon arresting the defendant, he and Sergeant Larry Johnson advised the defendant of his rights according to the Miranda decision, specifically stating that Officer Johnson read the defendant his rights from his "little Miranda card." He then identified State's Exhibit No. 4, a time card belonging to the defendant, which had been given him by T. J. Smith. Upon being shown State's Exhibit No. 10, an army jacket, State's Exhibit No. 11, a shirt, State's Exhibit No. 12, a pair of pants, and State's Exhibit No. 13, he testified said clothing was the same clothing the defendant was wearing the day of the arrest and they were removed as there appeared to be blood on the shirt. At the police station the defendant signed a rights waiver which was marked State's Exhibit No. 8, and later admitted into evidence. After the defendant signed the rights waiver at 2:30 p. m., and before interrogation, he requested he be allowed to talk with his wife and father, which request was granted, whereafter the defendant's wife and father arrived at approximately 5:00 p. m. After conversing with them for 30 minutes, the defendant voluntarily told the officers he was ready to talk and he admitted killing the decedent, Beverly Meeker. The witness further testified that the defendant thereafter agreed to return to the scene of the crime with the officers at which time the defendant related the incident as follows:

"He advised us he was headed toward work, he passed and followed several cars that had men in them, and Beverly Meeker's car when it came by saw that she was alone, he turned around and followed her for approximately two miles. At this time he stated that he pulled up along the side of her, honked his horn, pointed down to her tires and then forced her off the road. At this time he said he got out of the car, run up to the passengers side, got into the car with his knife open, put it up to her throat, and told her to drive to the boat ramp. He said he showed her how to drive to the boat ramp. Drove across the river east approximately nine tenths of a mile where he forced her off the road, drove approximatly 1 mile back down to the boat ramp, which is approximately one mile sir. He said then that he forced her to disrobe, that he had intentions of raping her, and at this time she started struggling and that is when he stuck her with the knife." (Tr. 126–127)

He stated that the defendant then showed them the general vicinity where he had disposed of the knife by throwing it into some trees. The knife was found on the 21st of February by Dr. Keith P. Sutton while assisting Officer Dirck and another in searching the area. He stated he was present when the knife was found and he was also present when photographs were taken of the knife. He observed Dr. Sutton place an "X" on the end of the knife and, upon being shown State's Exhibit No. 1 and State's Exhibit No. 14, he identified said exhibits as being the knife which was found and the photographs which were taken of the knife, respectively. Thereafter, State's Exhibits Nos. 9, 10, 11, 12 and 13, were admitted into evidence. On being shown State's Exhibit No. 15, pantyhose, State's Exhibit No. 16, a slip, and State's Exhibit No. 17, a dress, he testified that said clothing was found pulled down on the right leg of the decedent on February 15. Thereafter, these exhibits were admitted into evidence.

Keith Sutton testified he was a physician and had participated in a search for a knife. On being shown State's Exhibit No. 1 and State's Exhibit No. 14, he identified said exhibits as the knife he had found and a photograph of that same knife, respectively.

Larry Johnson testified he was employed with the Tulsa Police Department and that he arrested the defendant on the 16th of February, 1974, at Mid-Con Fabricators at the Port of Catoosa. He testified essen-

tially to the same series of events as did Officer Hamby.

Dr. Robert Fogle testified he was a pathologist at the Oklahoma Osteopathic Hospital and that he performed an autopsy on the decedent on February 15, 1974. In his opinion the death of the decedent was the result of stab wounds to the neck which had been caused by a bladed instrument or knife. An examination of the decedent's body revealed some 15 wounds, five of which were stab wounds. On being shown State's Exhibits numbered 18, 19 and 20, he testified that said exhibits were photographs of the decedent's body at the morgue on February 15, which represented various wounds to the body. Thereafter, said exhibits were admitted into evidence.

Donald Meeker testified he was the husband of the decedent and that identification of his wife was made on February 15, by Deputy Benny Dirck.

■ The defendant's first assignment of error asserts that the trial court erred in failing to grant the defendant a motion for change of venue which was premised on alleged adverse pretrial publicity, specifically several articles published in various county newspapers. In *Shapard v. State,* Okl.Cr., 437 P.2d 565 (1967), this Court adopted the language used in *United States v. Hoffa,* 156 F.Supp. 495 (S.D.N.Y.1957) as follows:

" 'Mere fact that there has been widespread adverse pretrial publicity about defendant does not, by itself establish reasonable probability that defendant cannot obtain a fair and impartial jury at criminal trial and is therefore entitled to postponement of trial for indefinite or substantial period of time.

" 'Mere fact that prospective jurors have read newspaper or other publicity items critical of defendant does not, by itself, establish bias, pre-judgment, or other disqualification on part of prospective jurors, and does not entitle defendant to postponement of trial for indefinite or substantial period of time.

" 'Where there has been widespread adverse pretrial publicity about defendant, proper procedure in vast majority of cases is not to postpone trial indefinitely or for substantial period of time, but to proceed to trial and to determine on voir dire of panel and individual talesmen whether fair and impartial jury can be selected.' " (at page 578)

■ We could have summarily disposed of this assignment by reason of the failure of the defendant to challenge any of the jurors for cause and preserve the record by taking exception to the ruling of the court denying said challenge; however, we need not rest our opinion on this procedural technicality. Title 22 O.S.1971, § 662, provides in pertinent part:

"In a challenge for implied bias, one or more of the causes stated in the second preceding section must be alleged. In a challenge for actual bias, the cause stated in the second subdivision of the third preceding section must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The. challenge may be oral, but must be entered upon the minutes of the court." (Footnotes omitted)

In *Shapard v. State,* supra, this Court compared the language of this statute to the language of the United States Supreme Court in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, and adopted such language as a test to be utilized in such cases. The language, in pertinent part, states:

" 'It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be

expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'* (Emphasis ours)" (at page 591) As in *Shapard v. State,* supra, in the instant case: (a) none of the jurors impanelled were challenged for cause by the defendant; (b) all of the jurors unequivocally stated that they would base their verdict on the evidence presented and lay aside any impression or opinion which they might have formed as a result of what they had read or heard discussed;[1] and, (c) the defendant was represented by two capable attorneys who were allowed extensively to examine the jurors called.

We are therefore of the opinion that the record supports that a fair and impartial jury was impanelled and the trial court did not err in overruling the defendant's motion for change of venue. For the reasons stated, we find defendant's first assignment of error to be without merit.

█ The defendant's second, third and fourth assignments of error having commonality of subject will be considered together. These assignments are premised on the defendant's assertion that the admission into evidence of the testimony of Officer Hamby and Officer Johnson regarding the defendant's confession to the murder of the decedent, Beverly Ann Meek-

er, was impermissible as the defendant alleges that the warnings he received prior to this confession were not in compliance with the mandate of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda v. Arizona,* supra, the United States Supreme Court stated:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." . ∴ . (384 U.S. at 444, 86 S.Ct. at 1612, Emphasis added, footnote omitted)

The record of the instant case reflects that the trial court properly conducted an admissibility hearing on the defendant's confession to the officers. The trial court overruled the defendant's motion to suppress the confession finding that the defendant, prior to such confession, was properly advised of his rights in accordance with *Miranda v. Arizona,* supra. The defendant contends the rights waiver utilized by the police in the instant case is defective within the meaning of *Miranda,* supra, as the warning failed to advise the defendant of his right to appointed counsel prior to interrogation.

On the basis of the record before us, we feel it not necessary to reach the constitutional adequacy of the rights waiver used in the instant case to dispose of these assignments. In the Miranda case itself, the Supreme Court stated:

"In dealing with statements obtained through interrogation, we do not purport

---

1. Such representations by the jurors ultimately impanelled are found in the record as follows: (1) Beatrice Huck (Tr. 28); (2) Hazel Riesinger (Tr. 239, 240 and 241); (3) Ethel Walker (Tr. 207, 211); (4) Patsy L. Hanes (Tr. 190, 191 and 192); (5) Ola Wright (Tr. 42); (6) Norman Schulze (Tr. 184 and 186); (7) Avery Bickell (Tr. 70, 71 and 106); (8) Fred Holland (Tr. 71–72 and Tr. 89–90); (9) Theresa Robinson (Tr. 159–160 and Tr. 162); (10) JoAnn Greggs (Tr. 224–225 and Tr. 226–227) (11) Isbel Hurd (Tr. 118); (12) Fern Vincent (Tr. 129–130).

to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (384 U.S. at 478, 86 S.Ct. at 1630, footnote omitted)

The testimony of Officers Johnson and Hamby reflects that the defendant was arrested at 12:40 p. m. on the 16th of February, 1974. The defendant was transported to the police station and, after changing into clothing furnished by deputies, the officers testified that the defendant was advised of evidence which would place him and his automobile in the vicinity of the scene where the body of the victim, Beverly Meeker, had been found, and at that time the defendant acknowledged he had been there, his automobile had been there, but at that time he said that before he talked to the officers further he wished to converse with his father and his wife. The officers testified that all questioning was stopped and the defendant's wife and father were summoned and arrived at 5:00 p. m. After the defendant visited with his father and his wife for 30 minutes, the defendant called Officer Johnson back into the office and stated he was willing to talk with him at that time and that he had taken the life of the victim, Beverly Ann Meeker.[2] Officer Hamby testified the defendant prefaced his statement to the officers by saying, "his wife told him that she had a right to know, she asked him if he did it."

Under the version of the facts binding upon us, we find the defendant's confession was wholly volunteered and not at all the product of police pressure, the pressure which Miranda condemned as threatening the Fifth Amendment privilege against self-incrimination. We further find that there was no "questioning initiated by law enforcement officers" within the scope of the Miranda decision. To confess was not the product of an interrogation, either direct or subtle, but was more in the nature of volunteered information and not violative of the Fifth Amendment, United States

---

2. These facts are reflected in the record as follows:

"A. I advised Mr. Rowbotham as part of our evidence we could establish that he and his automobile had been in the scene, approximately the vinicity (sic) of the scene where the body of the victim, Mrs. Meeker had been found on the morning of the 15th, near the highway 33 Verdigris River Channel intersection. Mr. Rowbotham at that time acknowledged that he had been there, his automobile had been there, but at that time requested before he talked to us any further that he be allowed to converse with his father and with his wife.

"Q. Was he allowed to do this sir?

"A. All questioning was stopped at that time, and his wife and his father was summoned.

"Q. And after he had an occasion to visit with his father and his wife, did you have further conversation with him?

"A. I did, sir.

"Q. What did that conversation consist of?

"A. Mr. Rowbotham called me back in the office after he had conversed with his wife, and stated that he was willing to talk with us at that time, that he had taken the life of the victim, Beverly Meeker, I then asked him why he did it, and his reply was; that he guessed the devil made him do it. At that time a short conversation took place between us, at which time I asked the defendant if he would be willing to return to the scene where the crime was committed, and relate to us exactly what had occurred. Mr. Rowbotham consented to do so and we then left the courthouse." (Tr. 153–154)

Constitution, nor Article 2, § 20, of the Oklahoma State Constitution. See, *Johnson v. State*, Okl.Cr., 448 P.2d 266 (1969).

Assuming arguendo that the defendant's confession in the instant case does fall within the Miranda Rule, we find the rights waiver signed by the defendant comports with all the directives of Miranda. The waiver of which the defendant was orally advised and which he also signed reads as follows:

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this same right to the advice and presence of a lawyer, even if you cannot afford to hire one. We cannot ourselves furnish you a lawyer, but one will be appointed for you, if you wish, when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"WAIVER

"I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me." (State's Exhibit No. 8)

The defendant asserts that the warning was an inadequate statement of the rights of one in custody as set forth in *Miranda*, which dictates specific advice that one has the right to the presence of a lawyer, not at some later time, but then and there; and thus because of such infirmity his waiver of his constitutional right to remain silent and to be given counsel at his interrogation was invalid as a matter of law.

We note the form of the warning used in the instant case has come under judicial review in numerous jurisdictions and there has been a diversity of decision on its adequacy. In *Wright v. State of North Carolina*, 483 F.2d 405 (4th Cir. 1973), citing with approval *United States v. Lacy*, 446 F.2d 511 (5th Cir. 1971), that court stated:

" 'We think this warning comports with the requirements of *Miranda*. Lacy was informed that he had the right to the presence of an appointed attorney before any questioning. The agents did say that the appointment of an attorney would have to be made by the court at a later date. But they also made perfectly clear that Lacy had a right not to answer questions until that time should come. Thus we think the twin requirements of *Lathers v. United States*, 5 Cir. 1968, 396 F.2d 524 were met: the defendant was informed that (a) he had the right to the presence of an attorney and (b) that the right was to have an attorney "before he uttered a syllable". That the attorney was not to be appointed until later seems immaterial since Lacy was informed that he had the right to put off answering any questions until the time when he did have an appointed attorney.'

"A like conclusion was earlier expressed by the same Court in *Mayzak v. United States* (5th Cir. 1968), 402 F.2d 152. There, the warning was substantially the same as that given here. The defendant was advised of his right to counsel but was told that he could not be furnished counsel 'until federal charges had been brought against him.' As here, the defendant contended such warning did not meet the strict standards of *Miranda*. In overruling the contention, the Court said (at 155):

" 'Stripped of its cry of pain, defendant's contention is simply that he was entitled to be warned not only of his right to counsel, but of his right to instant coun-

sel. *Miranda,* however, does not require that attorneys be producible on call, or that a Miranda warning include a time table for an attorney's arrival. Nor does it seem to us requisite that the officer conducting the interview declare his personal and immediate power to summon an attorney. The adequacy of the warning is not jeopardized by the absence of such embellishments.'

"The Second Circuit in *Massimo v. United States* (2nd Cir. 1972), 463 F.2d 1171, 1174, cert. denied, 409 U.S. 117, 93 S.Ct. 920, 34 L.Ed.2d 700, where a warning similar to that in this case was at issue, adopted the view stated in *Lacy* on the adequacy of the warning. Specifically, it rejected the conclusions on the point as reached in *United States v. Cassell* (7th Cir. 1971), 452 F.2d 533 and in *United States v. Garcia* (9th Cir. 1970), 431 F.2d 134, two of the authorities relied on heavily by the petitioner. We choose to follow the reasoning applied in *Lacy* and *Massimo* and to sustain the sufficiency of the warning." (at page 406–407)

An analogous situation was discussed in *Coyote v. United States,* 380 F.2d 305 (10th Cir. 1967), wherein Judge Murrah stated:

"Surely Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.

"It is, of course, always open to an accused to subjectively deny that he understood the precautionary warning and advice with respect to the assistance of counsel. When the issue is raised in an admissibility hearing, i. e. see *McHenry v. United States,* 10 Cir., 308 F.2d 700, it is for the court to objectively determine whether in the circumstances of the case the words used were sufficient to convey the required warning." (at page 308)

The law among the circuits and state courts is contradictory on this question.[3]

Today we reverse our holding enunciated in *Reese v. State,* Okl.Cr., 462 P.2d 331 (1969) and *Schorr v. State,* Okl.Cr., 499 P.2d 450 (1972), insofar as they are inconsistent with this opinion, and adopt the reasoning in *Wright v. North Carolina,* supra, thus finding that the rights waiver in the instant case satisfied the mandate of *Miranda.* For the reasons herein stated, we reject the defendant's second, third and fourth assignments of error.

■ The defendant's fifth assignment of error asserts that the prosecutor, in closing argument, commented upon the defendant's failure to testify, thus constituting reversible error in light of 22 O.S. 1971, § 701.[4] The prosecutor's comment of which the defendant now complains is found in the record as follows:

". . . And Ladies and Gentlemen, bear this in mind. The evidence presented by the State has gone uncon-

---

3. This was recently alluded to by Justice Douglas. The Supreme Court, with Justice Douglas dissenting, recently declined to accept review of a case presenting this question. *Wright v. North Carolina,* cert. denied, 415 U.S. 936, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974) (Douglas, J., dissented with opinion from denial.)

4. Title 22 O.S.1971, § 701, reads as follows: "In the trial of all indictments, informations, complaints and other proceedings against persons charged with the commission of a crime, offense or misdemeanor before any court or committing magistrate in this State, the person charged shall at his own request, but not otherwise, be a competent witness, and his failure to make such request shall not create any presumption against him nor be mentioned on the trial; if commented upon by counsel it shall be ground for a new trial."

tradicted. That is the evidence for you to consider. I don't know that these are Roger's clothes. I don't know that this is the clothes of Mrs. Meeker. I don't know if that is blood on that slip or not.

· · ·

"MR. DOUTHITT: Object to the statements, your honor, may we approach the bench.

"COURT: Yes sir.

"MR. DOUTHITT: At this time the defendant objects to the remarks of the State to the effect that the evidence of the State has gone uncontradicted. This is a clear indication to the jury that the defendant has failed to testify and his failure to testify is grounds for mis-trial and we move for mis-trial at this time.

"COURT: Overruled, sir." (Tr. 213)

The defendant asserts that the statement of the prosecutor was equivalent to saying the defendant had failed to take the stand to testify in his own behalf. We cannot agree with this contention as "fairly interpreted, it was an assertion that there had been no evidence controverting that presented by the State. It was in effect a comment on the fact that testimony of witnesses for the State had not been contradicted." See *Chesser v. State*, 63 Okl.Cr. 84, 73 P.2d 191 (1937). The Court in *Chesser* went on to say, citing *McDonald v. State*, 59 Okl.Cr. 318, 58 P.2d 345, as follows:

"'The statute, section 3068, supra, is comprehensive in the extreme and this court will not enlarge nor extend its provisions so as to prevent a fair discussion of the evidence, even though the defendant did not testify and called no witnesses in his behalf. This statute will not be deemed to go to the extent of prohibiting comment upon inferences reasonably to be drawn from a failure to controvert the state's evidence by proof other than that which might be given by the defendant personally. *Murrell v. State*, 34 Okl.Cr. 413, 246 P. 644; *McDaniel v. State*, 35 Okl.Cr. 425, 250 P. 804; *Sco-per v. State*, 22 Okl.Cr. 27, 208 P. 1044.' "It is our opinion that the county attorney did not exceed his privilege." (73 P.2d at page 197)

We further note this Court's holding in *Morrow v. State*, Okl.Cr., 508 P.2d 714 (1973), citing with approval *Spears v. State*, 97 Okl.Cr. 249, 261 P.2d 464, wherein in the fourth paragraph of the Syllabus this Court held:

"'Where a defendant fails to offer any evidence, the prosecutor is not prevented from discussing the evidence against him and to state that such evidence is uncontradicted. Such argument would not be a violation of the statute forbidding comment on the fact the defendant did not testify.'" (at page 717)

For the reasons herein stated we reject the defendant's fifth assignment of error.

■ In defendant's sixth assignment of error, he asserts that the trial court erred in overruling the defendant's objection to certain alleged prejudicial remarks made by the prosecution. The remark of which the defendant now complains is found in the record as follows:

" . . . Mr. Hamby and Mr. Johnson will relate to you ladies and gentlemen that on two different occasions they advised this defendant of his constitutional rights, what is known as the Miranda rights, warning, they will relate those rights they advised this defendant of, and after being fully advised of his rights, the defendant related to them, his actions on the 15th of February 1974, early morning hours, how he stabbed Beverly Meeker to death. And he will also ladies and gentlemen relate to you what the defendant told him what his reason and purpose for stabbing Mrs. Meeker to death. They will also relate to you ladies and gentlemen during the time that the defendant was making his confession to them, they inquired about the knife that was used in the fatal stabbing. That he agreed to take them back to the scene, show where he had thrown

the knife. . . . They will identify the knife they recovered as a result of where the defendant said he had thrown the knife after he had fatally stabbed Beverly Meeker. . . ." (Tr. 8–9, Vol. II)

The defense, citing *Wright v. State,* Okl. Cr., 325 P.2d 1089 (1958), submits that the test to be utilized in evidentiary harpoon cases is whether the defendant's right to a fair and impartial trial was materially prejudiced thereby or whether the harpoon complained of amounted to harmless error. He also cites *Davis v. State,* Okl.Cr., 489 P.2d 789 (1971); *Robinson v. State,* Okl. Cr., 507 P.2d 1296 (1973); and, *Belk v. State,* Okl.Cr., 520 P.2d 373 (1974). The defense goes on to say that such assignment of error is premised on anticipation that this Court would sustain the defendant's second, third and fourth assignments of error relating to the admissibility of the defendant's confession. In light of this Court's previous disposition of the defendant's second, third and fourth assignments of error, we find the sixth assignment of error to be without merit.

■ The defendant's seventh and eighth assignments of error, having commonality in subject, will be dicussed together. The defendant asserts the trial court erred in admitting various State's Exhibits as said exhibits were irrelevant, immaterial, of no probative value and thus served no purpose other than to inflame and prejudice the jury.

The defendant first complains of the admission into evidence of State's Exhibit No. 1, a knife. Defendant next complains of the admission into evidence of various items of defendant's clothing, and lastly defendant complains of admission into evidence of the various photographs of the victim.[5]

In *Abel v. State,* Okl.Cr., 507 P.2d 569 (1973), this Court noted:

"The second proposition contends that the court erred in admitting the photographs of the deceased into evidence. The defendant argues that the photographs were inflammatory and prejudicial and that no proper foundation was laid for their admission into evidence. We are of the opinion that the photographs were properly admitted. In *Pate v. State,* Okl.Cr., 361 P.2d 1086, we stated in the eighth and ninth paragraphs of the Syllabus:

" 'When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

" 'Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arrouse (sic) the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant.'

"The photographs in question were identified by several witnesses as being true and correct pictorial representations of the body of Jacqueline Abel as they observed her at the hospital. The pictures were not taken after extensive surgery and were not gruesome. The photographs clearly depict the various bruises upon the child's body and their probative value is not outweighed by the danger of prejudice to the defendant." (at page 572)

After carefully considering all of the State's Exhibits admitted into evidence, we feel that the probative value of said exhibits is not outweighed by the danger of prejudice to the defendant. For this reason we find the defendant's seventh and eighth assignments to be without merit.

5. The defendant's clothing was marked as State's Exhibit Nos. 10 through 13, and the photographs of the victim were numbered 5, 6, 7, 18, 19 and 20.

Having commonality in subject, the defendant's ninth, tenth and eleventh assignments of error will be considered together. Said assignments essentially assert that the record is void of any evidence sufficient to prove the defendant attempted to rape the victim and as such the defendant could not be guilty of murder in the first degree as set forth in 21 O.S.Supp.1974, § 701.1, ¶ 2.[6] The defendant thus contends that he was entitled to an instruction to the jury on second degree murder. The record reflects that the defendant requested an instruction to the jury and said request was refused by the trial court.

In the opinion of *Williams and Justus v. State*, Okl.Cr., 542 P.2d 554 (1975), this Court recently observed:

> "This Court indicated that 21 O.S.Supp. 1974, § 701.3, should be strictly construed to permit lesser included instructions only where clearly appropriate in *Murray v. State*, Okl.Cr., 528 P.2d 739 (1974), wherein we held that an instruction upon Second Degree Murder was improper in a First Degree Murder prosecution allegedly perpetrated pursuant to an armed robbery. . . ."

In *Kidd v. State,* Okl.Cr., 462 P.2d 281 (1969), the elements required to constitute an attempted crime were set forth as follows: (1) intent, (2) some overt act toward the commission of the crime, and (3) failure to consummate. In the instant case the defendant's own words to the officers were:

"  .   .   .   he stated his intentions were to have sexual intercourse with her.

\*     \*     \*     \*     \*     \*

"  .   .   . At that time he stated that the victim started removing her clothing and that during the removal of her clothing a struggle developed between he and she, at which time he stabbed the victim with the pocket knife he had.   .   .   . " (Tr. 155–156)

We feel this evidence clearly shows the defendant attempted to rape the decedent after which a struggle ensued and the defendant stabbed the decedent. Thus, we find the evidence only supports an instruction on first degree murder and the trial court properly refused the defendant's request to instruct the jury on second degree murder. For the reasons herein stated, we find the defendant's ninth, tenth, and eleventh assignments of error to be without merit.

The defendant's twelfth assignment of error asserts the death sentence could not be imposed because the jury was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction, in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). This contention is principally based on the exclusion of Mrs. Helt in that she was excused because she expressed doubt as to whether or not she could assess the death penalty.[7] In the re-

---

6. Title 21 O.S.Supp.1974, § 701.1 in pertinent part reads:
   "When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;"

7. "MR. HOPPER: Thank you your Honor. Mrs. Helt, have you ever served on a jury before.
   "MRS. HELT: No.
   "MR. HOPPER: How long have you lived in Rogers County.
   "MRS. HELT: Practically all my life.

   "MR. HOPPER: Do you have a family maam.
   "MRS. HELT: Yes.
   "MR. HOPPER: What does it consist of.
   "MRS. HELT: Two boys.
   "MRS. (sic) HOPPER: Mrs. Helt, do you have any quarrel with the law that makes it a capital offense for a person to take the life of another person without justifiable cause or without authority of law.
   "MRS. HELT: No.
   "MR. HOPPER: Do you believe in capital punishment.
   "MRS. HELT: Yes.
   "MR. HOPPER: If the State should meet its burden in this case and prove to you

cent opinion of *Justus v. State*, Okl.Cr., 542 P.2d 554 (1975), this Court noted:

"We are of the opinion that a challenge for cause is appropriate to the extent that the venireman is equivocal and uncertain regarding his capacity to follow the law and honor the oath of a juror. . . . Clearly, no prospective juror with animosity concerning the death penalty should be excused upon this basis if able to set aside personal beliefs or attitudes and fulfill the oath to try the case impartially according to the law and the evidence. However, if satisfied of the defendant's guilt beyond a reasonable doubt, a venireman is unresolved as to whether he could then assess the death penalty, or knowing the death penalty to be mandatory upon conviction, he is uncertain whether he could stand indifferent between the defendant and the State in deliberating his verdict according to the law and the evidence, then he has to that extent forewarned the court that he is undecided whether he could comply with the oath of a juror. A challenge for cause should be granted against such a venireman, for otherwise the administration of the oath would be frivolous. We agree with the cogent argument of the State that the trial court should not accept a juror who does not know whether he can follow the law, and that to do otherwise would create chaos and make our system of jurisprudence a mockery based upon the personal whims of individuals. The State, as well as the defendant, is entitled to a fair and impartial jury. . . ." (Citations omitted)

The examination of Mrs. Helt unquestionably reveals that she had personal reservations concerning the death penalty, and that she vacillated regarding her capacity to set those reservations aside and otherwise be a fair and impartial juror and, thus, we feel she was properly excused.

For the reasons herein stated, we find the defendant's twelfth assignment of error to be without merit.

█ The defendant's final assignment of error asserts the death sentence is unconstitutional by virtue of the decision of the United States Supreme Court in the consolidated cases of *Furman v. Georgia, Jackson v. Georgia,* and *Branch v. Texas,* 408 U.S. 238, 92 S.Ct. 2726, 32 L.Ed.2d 346 (1972). However, in this regard we need only observe that this contention was fairly analyzed and rejected by this Court in the consolidated opinion of *Williams and Justus v. State,* supra.

Pursuant to Rule 1.11 of this Court, 22 O.S.Supp.1974, Ch. 18, App., this case was previously assigned and heard for oral argument. We have now carefully reviewed the entire record before this Court and have thoroughly considered the argument and authority presented. Pursuant to the provisions of 21 O.S.Supp.1974, § 701.5, we have determined that the record is free of any error of law requiring reversal or modification. The judgment and sentence is, accordingly, *affirmed.*

We also observe this Court's recent decision in *Williams and Justus v. State,* supra, holding that the evidentiary hearing contemplated under the provisions of 21 O.S. Supp.1974, §§ 701.5 and 701.6, is unnecessary. We further note pursuant to Rule 1.-18, 22 O.S.Supp.1974, Ch. 18, App., the defendant is advised that any Petition for Rehearing herein must be filed with the Clerk of this Court within fifteen (15) days of the date upon which this opinion is filed therein.

---

and eleven other jurors that the defendant did in fact commit the crime of first degree murder, could you return a verdict of guilty knowing what the punishment would be.
"MRS. HELT: I just don't know.
"MR. HOPPER: It is a tough question, isn't it.

"MRS. HELT: Yes it is.
"MR. HOPPER: Do you have some doubt in your mind, as to whether you could assess the death penalty.
"MRS. HELT: Yes.
"MR. HOPPER: We would ask that this juror be excused." (Tr. 194–196)

BRETT, P. J., concurs in part and dissents in part.

BUSSEY, J., concurs.

BRETT, Presiding Judge (concurring in part and dissenting in part):

Although I concur in the affirmance of Rowbotham's conviction, I must dissent from that portion of the majority's opinion which overrules the cases of *Reese v. State,* Okl.Cr., 462 P.2d 331 (1969), and *Schorr v. State,* Okl.Cr., 499 P.2d 450 (1972), and declares adequate the *Miranda* warning contained in the printed waiver of rights form which Rowbotham signed.

I believe the majority opinion correctly concludes that Rowbotham's confession was admissible regardless of any defect in the *Miranda* warning which he had been given for the reason that it was a volunteered statement. The record supports that Rowbotham voluntarily initiated the giving of that statement and that it was not a product of questioning nor the result of coercive circumstances. Such statements are, as the majority points out, sanctioned by this Court and expressly authorized by the *Miranda* opinion. For that reason, I agree that Rowbotham's confession was properly admitted into evidence against him.

I cannot, however, agree with that portion of today's decision which overrules *Reese v. State,* supra, and *Schorr v. State,* supra, and which holds that the *Miranda* warning contained in the printed form signed by Rowbotham was adequate to meet the standards set by *Miranda.* I continue to believe that the addition to the *Miranda* warnings of the statement,

"We cannot ourselves furnish you a lawyer, but one one will be appointed for you, if you wish, when you go to court."

is impermissible and would under certain circumstances constitute a fatal defect.

In this matter I find myself more persuaded by the reasoning of *United States ex rel. Williams v. Twomey,* 467 F.2d 1248 (7th Cir. 1972), than by that of *Wright v. North Carolina,* 483 F.2d 405 (4th Cir. 1973), relied upon by the majority. Speaking of a like addition to a *Miranda* warning, the opinion in *United States ex rel. Williams v. Twomey,* supra, states:

"We hold that the warning given here was not an 'effective and express explanation;' [*Miranda,* 384 U.S. 436 at 473, 86 S.Ct. 1602]. To the contrary, it was equivocal and ambiguous. In one breath appellant was informed that he had the right to appointed counsel during questioning. In the next breath, he was told that counsel could not be provided until later. In other words, the statement that no lawyer can be provided at the moment and can only be obtained if and when the accused reaches court substantially restricts the absolute right to counsel previously stated; it conveys the contradictory alternative message that an indigent is first entitled to counsel upon an appearance in court at some unknown future time. The entire warning is therefore, at best, misleading and confusing and, at worst, constitutes a subtle temptation to the unsophisticated, indigent accused to forego the right to counsel at this critical moment." 467 F.2d at 1250.

The point is that the warning under discussion here makes clear that the accused has the right to have a lawyer prior to questioning, and that if he cannot afford one, one will be appointed for him *when he goes to court*; but it fails to make absolutely clear that the accused is entitled to an *appointed* lawyer prior to questioning. I believe the ambiguity thus imported into the warning causes it to fall short of the standard of clarity required by the *Miranda* decision.