James Harvey DEASON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–822.

Court of Criminal Appeals of Oklahoma.

March 28, 1978.

John J. Tanner and James W. Feamster, III, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., Duane N. Rasmussen, Legal Intern, for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, James Harvey Deason, hereinafter referred to as defendant, was charged with the offense of Murder in the Second Degree, pursuant to 21 O.S.Supp.1973, § 701, and was tried and convicted in the District Court, Tulsa County, Case No. CRF–76–136. The trial court sentenced the defendant to serve a term of not less than ten (10) years, nor more than life in an institution to be designated by the Department of Corrections. From said judgment and sentence, the defendant has perfected his appeal to this Court.

The first witness called by the State was Andrew Angove, son of the deceased, Mrs. Dolores Angove. Andrew testified that he arrived home between 12:15 and 12:30 a.m. on January 17, 1976, and found the defendant talking on the telephone to the deceased. Andrew testified that the defendant handed the phone to him, and he spoke with his mother who was at the police sta-

tion with her younger son Matthew. The defendant left the house and approximately 30 minutes later the deceased arrived with Matthew. A short time later the defendant returned and motioned for the deceased to go into the living room with him, which she did. Andrew went upstairs to his bedroom, and had gone to bed when he heard a "thud" downstairs. Andrew went downstairs and saw the defendant standing in the living room. There was blood on the defendant and the couch. The deceased was slumped, apparently unconscious, on the couch. Andrew testified the defendant told him he had become angry and struck the deceased, but she would be all right. Andrew ran upstairs and called an ambulance. When he returned the deceased was lying in the driveway and the defendant was standing nearby. Andrew asked the defendant what he was doing, but received no response so he ran upstairs and called the police.

Andrew also testified that approximately a month and a half prior to his mother's death the defendant had struck her, and Andrew had called the police. Andrew stated that his mother had been seeing the defendant since November of 1973. Andrew indicated the defendant generally came to the house about twice a day and was usually drinking.

Matthew Angove, younger son of the deceased, was the next witness called by the State. Matthew testified that after the defendant returned he went to his room, and the first indication he had that anything was wrong was when he heard the defendant saying his mother's name several times. Matthew left his room and questioned his brother as to what was wrong. He then went downstairs to the living room where he saw a table knocked over and blood on the couch. He went back upstairs but returned again and looked out the patio door, where he saw his mother with bloody clothes, lying on the right hand side of the driveway. Matthew then ran upstairs to his room, and upon hearing his brother question the defendant as to where he was taking the deceased, attempted to take down the license tag number of defendant's automobile as it was leaving.

Dr. Lee F. Beamer next testified for the State. Dr. Beamer performed an autopsy on the deceased at 11:50 a.m., January 17, 1976. He testified that there was a projectile wound in the upper inner corner of the left eye of the deceased, and that he recovered a jacketed lead projectile from the deceased's head. On cross-examination, he stated that it was his opinion that the weapon had been fired at a distance of approximately 12 to 14 inches from the face of the deceased.

Donald E. Perryman, a Tulsa police officer, testified that he arrived at the Angove residence at approximately 3:00 a.m. on January 17, 1976. He and another officer who arrived moments later took charge of the scene. Officer Perryman stated that he and the other officer preserved all the evidence to the best of his knowledge.

Carl Gene Akins, an investigator for the Tulsa Police Department, testified that when he arrived at the scene three officers, including Officer Perryman, were present. He testified that he took charge of the scene until the senior investigator arrived.

Dempsey Shelton, a Sapulpa police officer, testified that he was acquainted with the defendant, and that at about 3:00 a.m. on January 17, 1976, he observed the defendant's vehicle pull into a service station owned by the defendant's father. Officer Shelton received a call from headquarters advising him that the defendant was wanted in connection with a homicide. Shelton then returned to the vicinity of the gas station and saw the defendant's car parked in front of the home of defendant's parents. Two other policemen, Officers Carver and Duncan, arrived on the scene. They observed the defendant standing inside a screened porch and commanded him to come out. Defendant was informed that he was under arrest, but refused to obey Officer Shelton's order to take his hands out of his pockets. Officer Shelton testified that when the defendant was approximately two or three feet in front of them he attempted to pull a pistol from his pocket, whereupon

the officers grabbed the defendant. It required considerable force to subdue the defendant, and Officer Shelton stated that a loaded .38 revolver, with one shell spent, was taken from him. The defendant was then transported to jail by Officer Carver.

Officer Carver testified next, followed by Officer Duncan, both relating essentially the same information as had been given by Officer Shelton.

The State then rested.

The defendant called several character witnesses who indicated their belief that the defendant had a reputation for being honest and truthful.

John Weiser was called and qualified by the defense as an expert in the field of handguns. He testified that if the hammer were pulled back on the pistol, previously introduced as the weapon taken from defendant upon his arrest, to the point just before it locked there would possibly be enough force for it to fire. Mr. Wiser testified it would be unlikely that the hammer could be pulled back by catching on clothing.

Pauline Deason, wife of the defendant, testified that she had not known of the affair between the defendant and the deceased. She stated she had been married to the defendant for 25 years, and that he was not a violent man although he had struck her once the previous year.

The defendant testified that he called the deceased on the night of her death and asked if he could see her. He admitted that he had a couple of drinks before he arrived at her house, where he found a note taped to the door, which said that she had gone to the police station. The door was unlocked so he entered the house and fixed another drink. The deceased called on the telephone and the defendant spoke with her. He then went to a club and had some more drinks. When he went back to the house the deceased had returned, and they went into the living room to talk. The defendant testified that he had taken the pistol into the house, as he had on several occasions, for the purpose of leaving it there in case

he was stopped on the way home. As they were talking, he played with the weapon, cocking the hammer and then pulling the trigger with his thumb on the hammer so that it came down gently. But when the deceased told him to put the pistol away he did so. Later, as he was about to leave he remembered that he had placed it in his pocket. He stated that he pulled it out to place it on a table, cocking the hammer and intending to ease it back down, when the hammer slipped and the weapon discharged. The deceased was struck in the head. He testified that he tried to carry her to his car, but fell in the driveway with her. He tried to revive her but she had stopped breathing. He then got into his car and left.

Defendant's first assignment of error is that the admission of State's Exhibit No. 2, a black and white photograph of the deceased, was prejudicial to the rights of the defendant. We cannot agree with this contention. This Court has consistently held that such photographs are admissible in evidence when they have some probative value, and when that value is not outweighed by the possibility of prejudice to the defendant. See *Pate v. State,* Okl.Cr., 361 P.2d 1086 (1961), where we stated in the eighth and ninth paragraphs of the Syllabus:

"When a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and this is equally true whether it relates to persons, things, or places.

"Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible; when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant."

The photograph in question accurately depicted the victim and the scene of the crime. It provided corroboration for the testimony of both Andrew Angove and the

pathologist, and it allowed the pathologist to identify the deceased as the body on which he had performed the autopsy. The probative value of the photograph was not outweighed by the danger of prejudice to the defendant. See, *Rowbotham v. State,* Okl.Cr., 542 P.2d 610 (1975). For this reason we find the defendant's first assignment of error to be without merit.

■ Defendant's second assignment of error is that the prosecutor engaged in activities throughout the course of the proceedings which were so prejudicial that the defendant was denied his right to a fair and impartial trial. The defendant contends that the District Attorney cursed and used violent language with the intent to impassion and prejudice the members of the jury. Defendant apparently refers to the use by the District Attorney of the word "damned" at one point in his cross-examination of the defendant. In *Samples v. State,* Okl.Cr., 337 P.2d 756, 761 (1959), this Court held:

"[T]he principle long adhered to by this court [is] that a conviction will not be reversed for alleged misconduct of the prosecuting attorney, unless this court can say that the prosecuting attorney was not only guilty of misconduct, but that such misconduct might, in some degree, have influenced the verdict against the defendant. . . ." (Citations omitted)

In the instant case we do not find that the defendant was prejudiced by the conduct.

■ Defendant contends that the prosecuting attorney invaded the province of the jury during closing argument by telling them to rule out all instructions with the exception of the instruction on murder in the second degree. This argument is frivolous. In passing we note that at no point did defense counsel object to the argument of the prosecutor. Even on the merits of the question, however, the defendant's contention is groundless. In *Battle v. State,* Okl.Cr., 478 P.2d 1005 (1970), this Court held that the right of argument contemplates a liberal freedom of speech and that the range of discussion, illustration and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom, and it is only when argument by counsel for the State is grossly improper and unwarranted upon some point which may affect the defendant's rights that a reversal can be based on improper argument. The argument of counsel has been carefully scrutinized, and we find nothing therein which would warrant reversal. The District Attorney argued that based on the evidence, the jury should find the defendant guilty as charged. Cf., *Noble v. State,* Okl.Cr., 497 P.2d 452 (1972).

Defendant further contends that the prosecutor engaged in a continued "barrage" of improper activities, and urges reversal on this basis, citing *O'Brien v. State,* Okl.Cr., 540 P.2d 579 (1975). We find nothing in *O'Brien* to indicate that the decision there was based on anything other than specific prejudicial errors committed by the prosecutor, while the defendant in the instant case fails to specify any incidents of the alleged "barrage of activities." We have examined the record and reviewed the testimony, and we can discover none of the activities to which defendant alludes. Therefore, we hold this contention to be without merit. See, *Washington v. State,* Okl.Cr., 554 P.2d 1194 (1976).

■ Defendant's third assignment of error is that the trial court erred in allowing testimony of prior arguments between the deceased and the defendant. Defendant contends this testimony was not probative of any material allegations in the case. The trial judge ruled that the testimony was admissible insofar as premeditation was an element of murder in the second degree (Tr. 182). See, 21 O.S.Supp.1973, § 701.2. We find no error in the admission of this testimony. In *Wadley v. State,* Okl. Cr., 553 P.2d 520, 523 (1976), this Court stated:

"It is fully recognized that where hostile emotions at a particular time are to be proved in a case, the existence of the same emotion in the same person at another time is proper evidence. II Wig-

more on Evidence, § 396 (3rd ed. 1940). And the conduct, attitude, and feelings of the accused and the deceased toward each other may be shown in a murder case to establish motive, malice or intent. I Wharton's Criminal Evidence § 175. Evidence of prior assaults by the defendant upon the deceased is admissible in such a case even though such evidence constitutes evidence of another crime. II Wigmore on Evidence, § 363 (3rd ed. 1940). . . ." (Citations omitted)

This Court has long recognized this rule. See, *Tapedo v. State,* 34 Okl.Cr. 165, 245 P. 897 (1926).

Defendant contends that the incidents testified about were so remote in time as to be incompetent and irrelevant. The testimony was to the effect that the arguments occurred in December of 1975 (Tr. 182). The deceased died on the 17th of January, 1976. Therefore, we find the incidents were not too remote in time from the homicide, and were admissible as tending to establish the element of premeditation. See *Sawyer v. State,* 94 Okl.Cr. 412, 237 P.2d 167 (1951), wherein this Court held that a fight 60 days prior to a homicide was admissible.

The defendant's final assignment of error is that he was denied his State and Federal constitutional rights by the sentence imposed in this case. Title 21 O.S. Supp.1975, § 701.4, under which the defendant was sentenced, calls for imprisonment "in *the* State Penitentiary" (emphasis added). He contends that this clearly means that he must serve his entire term in the State penitentiary at McAlester. Such a sentence, he claims, denies him equal protection of the law and constitutes cruel and unusual punishment, in that the Department of Corrections is deprived of all discretion in handling his case. This argument is patently frivolous. The clear intent of the legislature was that one convicted of murder in the second degree should be committed to the Department of Corrections. The precise institution of his incarceration is for the Department to determine.

The defendant also argues that he has been denied due process and equal protection of law, and that a cruel and unusual punishment has been imposed upon him inasmuch as the statutory indeterminate sentence constitutes an infringement by the legislature on the judicial branch and invades the province of the jury. His ground for this argument is his assertion that the trial court is prohibited by the statute from exercising its inherent power to suspend the sentence. This assertion, too, is patently frivolous. As we have previously observed, the trial court has the inherent power to suspend a sentence, unless the legislature has expressly prohibited it, as it has the power to do. Compare, *Chatman v. Page,* Okl.Cr., 484 P.2d 537 (1971), and *Curry v. Page,* Okl.Cr., 484 P.2d 887 (1971), with *Black v. State,* Okl.Cr., 509 P.2d 941 (1973).

And finally, the defendant contends that an indeterminate sentence, per se, is cruel and unusual punishment. Defendant cites no authority for this contention, and we find no merit in it. If anything, such a sentence operates in the defendant's favor because it permits his release at the earliest possible time, consistent with his rehabilitation.

For the above and foregoing reasons the judgment and sentence is *AFFIRMED.*

CORNISH, J., concurs.

BRETT, J., specially concurs.

BRETT, Judge, Special Concurrence:

I concur that this conviction should be affirmed, but I retain my position stated in my dissent to *Black v. State,* supra.