**Randall Eugene CANNON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–93–526.

Court of Criminal Appeals of Oklahoma.

Sept. 8, 1995.

Order Denying Rehearing Oct. 6, 1995.

James T. Rowan, Assistant Indigent Defender, Norman, for defendant at trial.

Lou Keel, Susan Caswell, Assistant District Attorneys, Oklahoma City, for State at trial.

Cindy G. Brown, Assistant Appellate Indigent Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for appellee on appeal.

### OPINION

CHAPEL, Vice Presiding Judge:

Randall Eugene Cannon was tried by jury before the Honorable Thomas C. Smith in the District Court of Oklahoma County, in Case No. CRF–85–3254. He was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1981, § 701.7, Third Degree Arson in violation of 21 O.S.1981, § 1403(A), First Degree Rape in violation of 21 O.S.1981, § 1114, and Forcible Anal Sodomy in violation of 21 O.S.Supp.1982, § 888. At the conclusion of the first stage of trial, the jury returned a verdict of guilty.[1] During sentencing, the jury found 1) the murder was especially heinous, atrocious, or cruel; 2) there was a probability that Cannon would commit criminal acts of violence that would constitute a continuing threat to society; and 3) the murder was for the purpose of avoiding arrest or prosecution. Cannon was sentenced to death for the murder conviction, ten years incarceration for arson, forty years

---

1. Under Oklahoma law, capital trials are conducted in two stages. First, the jury determines the issue of guilt or innocence. If a jury finds a defendant guilty of first degree murder, the trial proceeds to a sentencing stage where the jury determines whether a sentence of life, life without the possibility of parole, or death is the appropriate punishment. 21 O.S.Supp.1989, § 701.10.

for rape, and twenty years for sodomy. From these convictions Cannon has perfected his appeal, raising sixteen propositions of error.

Around 10 p.m. on June 24, 1985, Cannon[2] and Loyd LaFevers broke into 84–year–old Addie Hawley's house. The two ransacked the house, beat Hawley, forced her into her Buick, and drove off. At some point they put Hawley in the trunk. They may have stopped and filled a bottle or gas can with gasoline. Eventually LaFevers and Cannon stopped near a vacant lot, took Hawley out of the trunk, beat her again, then poured gasoline on her and set her afire. They drove the Buick to another vacant area a short distance away and set it on fire as well. Witnesses saw the two with a gas can by the car and running from the scene. Before midnight, firefighters found Hawley still alive. She died about 5:30 a.m. of both blunt force head trauma and burns covering 60–65% of her body. Either injury would have caused death.

### PRETRIAL ISSUES

■ Cannon argues in Proposition IX that his custodial statement was involuntary and inadmissible because it was obtained through an illegal arrest and detention. Cannon was arrested on an outstanding misdemeanor warrant and two outstanding traffic warrants. He seems to suggest the traffic warrants did not exist and alleges the misdemeanor warrant was invalid.[3]

The State first suggests that Cannon has waived this argument. No pretrial motion raising the legality of the arrest appears in the record, and such a motion was not among the 58 defense motions and objections heard in the motions hearing of April 29, 1993. Cannon's statements comprised the primary evidence in a hearing held after voir dire and before opening statements on a motion to suppress evidence gathered from illegal arrest. The State argues that Cannon waived all objection to the legality of the arrest if he entered a plea to the charges before raising the issue.[4] Cannon responds that he is challenging the admission of his confession based on an illegal search and seizure, and that such a challenge (which must be interposed at the first opportunity) may be made at the beginning of the trial by a motion to suppress the evidence.[5] While the State has a point, Cannon is directly attacking the admission of his confession, not directly attacking the validity of the arrest. As the procedural question is arguable we address the substance of the proposition.[6]

2. Cannon and LaFevers were initially tried together in March, 1986, and convicted of first degree burglary, first degree robbery, kidnapping, larceny of a motor vehicle, malice murder, third degree arson, first degree rape, and forcible anal sodomy. On appeal this Court affirmed the first four convictions but reversed the latter four, holding that the defendants had mutually antagonistic defenses as to those charges and should be tried separately. *Cannon v. State*, 827 P.2d 1339 (Okl.Cr.1992) (*Cannon1*); *Lafevers v. State*, 819 P.2d 1362 (Okl.Cr.1991) (*Lafevers1*). The *Cannon1* opinion often refers to analysis in *Lafevers1*. Cannon and LaFevers were subsequently tried separately. This Court recently affirmed LaFevers' conviction for first degree murder and third degree arson. *LaFevers v. State*, 897 P.2d 292 (Okl.Cr.1995) (*LaFevers2*).

3. Cannon emphasizes that police did not have a copy of the warrant at the time of arrest. He acknowledges that police are not required to have the warrant with them as long as a defendant is informed officers are acting under authority of a warrant (Cannon was so informed) and officers can produce the warrant if a defendant asks to see it (Cannon did not). *Wilson v. State*, 871 P.2d 46 (Okl.Cr.1994). Contrary to

the plain language of the case, Cannon argues *Wilson* holds that officers must have actual possession of the warrant. This whole argument is irrelevant to the issue of whether the warrant was valid.

4. *Fischer v. State*, 483 P.2d 1162 (Okl.Cr.1971); *Miles v. State*, 416 P.2d 964 (Okl.Cr.1966).

5. *Thigpen v. State*, 462 P.2d 270 (Okl.Cr.1969) (defendant objected when illegal search was first used to support evidence).

6. The State also suggests that Cannon's previous convictions for the non-intent crimes resulting from this arrest should collaterally estop him from attacking the validity of the arrest in this case, as validity of the arrest could have been raised in that direct appeal but was not. The State cites cases which hold that, in a civil suit based on actions which resulted in criminal proceedings, parties are collaterally estopped from relitigating issues which were conclusively determined in the prior criminal proceedings. The State submits that "it should be even more true that parties in a subsequent criminal action are estopped from relitigating issues that have been

 Cannon claims that the misdemeanor warrant was invalid on its face. Cannon was arrested on an outstanding misdemeanor warrant for "violation of suspended sentence".[7] The warrant is facially valid but it lacks an endorsement setting the amount of bail. Cannon argues that the law requires a warrant to fix the amount of bail with an endorsement to that effect for all bailable offenses.[8] This Court has not found, and Cannon fails to cite, any cases holding that failure to include the bail endorsement on the warrant at the time of arrest renders the warrant invalid.[9] The State argues that bail was not set on the warrant because Cannon was never brought before a magistrate on that charge (at which time bail would have been determined). Less than 24 hours after Cannon's June 25 arrest, he was charged with murder and the accompanying offenses and held without bond on those charges. Generally speaking, a delay of more than 48 hours is presumptively unreasonable.[10] Cannon claims he was prejudiced by the lack of endorsement and the delay in seeing a magistrate because, if bail had been set at the time of arrest, he could have made bail and

been out of jail before the time he made statements about Hawley's murder to officers the following day. This is speculative at best. We do not find that the warrant was invalid on its face, and any possible error would be harmless because Cannon has not shown he was prejudiced. In addition, if the misdemeanor warrant were thrown out, the traffic warrants appear sufficient to uphold the legality of the arrest.[11]

Cannon also claims that the illegal arrest requires suppression of his custodial statements. As the arrest was not illegal, Cannon's statements were not "fruits of the poisonous tree" and were admissible.

 In Proposition X, Cannon complains the State failed to adequately establish that he knowingly and voluntarily consented to a warrantless search of his home. Cannon was arrested and booked on misdemeanor and traffic warrants during the late afternoon or evening of June 25. The next morning Officer Pacheco came to Cannon's cell and asked if he would sign a consent to search form allowing police to search his

conclusively litigated in a prior criminal case." Whatever the merits of this statement on its face, as applied to this case it is incorrect. First, these concepts apply to litigation at trial, and the State is attempting to extend them to appellate determinations. Second, the crimes charged and issues raised in this trial are not the same as the crimes charged and issues raised in *Cannon1*. Third, the issue of the validity of arrest was not conclusively determined in *Cannon1*, nor (as regards the appellate opinion) was it litigated at all. Saying that Cannon could have raised that issue in that appeal is not the same as saying it was conclusively litigated. The State is confusing this with collateral estoppel as applied to post-conviction review of a capital case in which an appeal has been decided: there, a defendant is estopped from raising in later appellate proceedings an issue which could have been raised on direct appeal. This is the first direct appeal. This case cannot turn on whatever issues were or were not raised in *Cannon1*. Fourth, the analogy between criminal and civil cases is faulty. The Oklahoma Supreme Court noted that in a civil context, estopping parties from relitigating issues properly determined in a prior criminal proceeding conserved judicial resources and was proper because the civil plaintiff was not benefitting from the prior criminal prosecution. *Lee v. Knight*, 771 P.2d 1003, 1006 (Okl.1989). By following the State's suggestion here, this Court

would allow the same criminal "plaintiff" (the State of Oklahoma) to benefit from an issue that was not directly litigated or raised on appeal in previous criminal proceedings. Cannon is not collaterally estopped from raising questions regarding his arrest.

7. A copy of the warrant was submitted as a supplemental record on appeal and accepted as tendered for filing on April 1, 1994.

8. 22 O.S.1991, § 173.

9. Cannon's cited cases concern warrantless misdemeanor arrests.

10. *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *Black v. State*, 871 P.2d 35, 37, 45 (Okl.Cr.1994) (see both majority opinion and Chapel, J., dissent).

11. The arresting officers testified that they knew of one outstanding misdemeanor warrant and two traffic warrants. While they did not have the warrants at the time of arrest, evidence showed that they needed a copy of the traffic warrants in order to book Cannon on those charges. The record clearly indicates the warrants existed and would have been sufficient to sustain the arrest without the misdemeanor warrant.

house. In a *Jackson–Denno* [12] hearing, Pacheco testified he explained the request, and Cannon agreed to sign a consent form if his brother or parents were present during the search. Pacheco testified he interpolated that condition on the form and Cannon signed it.[13] Cannon testified he did not remember this at all. He said the only people who visited him on the 26th were the same officers who arrested him (including Pacheco); Cannon denied signing the consent form and said the signature on the form was not his. Cannon signed another sheet of paper while on the stand; the record indicates that signature differed from the one on the consent form (Defendant's Exhibit 1 does differ slightly from the signatures on Cannon's written statement, which he also could not remember signing). The original consent form was apparently lost between the first and second trials and the photocopy provided for the hearing was not admitted into evidence. The trial court found Cannon gave knowing and voluntary consent to search. Where evidence taken *in camera* is sufficient to support a trial court's ruling that a defendant's statements are voluntary and admissible, this Court will not disturb the ruling on appeal.[14]

Cannon concedes that police do not need a warrant to conduct a consent search,[15] but claims that the State has not met its burden to show he knowingly and intelligently waived his right to a search warrant.[16] Cannon claims that Pacheco's visit did not happen and he never signed the form. Cannon asserts that the signature on the form is not his, as it does not match Defendant's Exhibit 1.[17] Cannon succeeded in preventing the copy of the consent form from being admitted into evidence, therefore this Court cannot compare the signatures. The trial court, however, had ample opportunity to compare the two and determined that the evidence showed Cannon signed the form. Without any evidence to review, this Court will not second-guess the trial court's decision. In addition, Pacheco's evidence clearly supports the trial court's ruling that Cannon knowingly and voluntarily waived his right to a search warrant.

## JURY SELECTION

In Proposition XVI, Cannon complains of voir dire errors in three subparts. He claims a juror was improperly excused for cause, another juror was improperly not excused for cause, and that he should have received additional peremptory challenges.

■■■■ Cannon first argues that prospective juror Vann was improperly excused for cause. Cannon's right to an impartial jury prohibits the exclusion of venire members who voice general objections to the death

---

**12.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) established a defendant's right to an *in camera* hearing on the voluntariness of his confession.

**13.** Evidence did not show whether Pacheco repeated the *Miranda* warnings before asking Cannon for consent to search. Cannon claims this Court has held that a valid custodial consent to search must be preceded by *Miranda* warnings. He relies on *Schorr v. State*, 499 P.2d 450 (Okl. Cr.1972), *overruled on other grounds, Rowbotham v. State*, 542 P.2d 610 (Okl.Cr.1975), *judgment vacated and remanded*, 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215 (1976), *modified to life imprisonment*, 554 P.2d 814 (Okl.Cr.1976). Although nothing specifically overrules this portion of *Schorr*, it is cited only in dissenting or questioning opinions subsequent to *Rowbotham*. Since *Rowbotham* this Court has not held *Miranda* warnings are required before obtaining consent to search. The record here does not show whether Pacheco gave Cannon *Miranda* warnings when discussing the consent form, but Cannon received such warnings on the evening of the 25th when he was taken into custody and

booked. Cannon has not alleged that he requested an attorney or invoked his right to silence at that time. Testimony showed that officers did not speak to Cannon between booking and Pacheco's visit. Cannon does not allege that he did not understand his rights vis a vis the consent form.

**14.** *McGregor v. State*, 885 P.2d 1366, 1377 n. 20 (Okl.Cr.1994); *Turner v. State*, 803 P.2d 1152, 1158 (Okl.Cr.1990), *cert. denied*, 501 U.S. 1233, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991).

**15.** *Kennedy v. State*, 640 P.2d 971, 980 (Okl.Cr. 1982).

**16.** See, e.g., *State v. Kudron*, 816 P.2d 567 (Okl. Cr.1991) (failure to object to search does not equal consent).

**17.** Cannon also claims the signature on the consent form is completely different from his signatures on other documents in the record.

penalty or express scruples against its imposition.[18] The relevant question is whether the juror's views could prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his oath.[19] A juror's views do not have to be proved with unmistakable clarity.[20] This Court has held responses such as "I don't believe I could" sufficient to dismiss jurors for cause.[21] The manner and extent of voir dire are within the discretion of the trial court, and will not be disturbed absent an abuse of discretion.[22]

■ Cannon argues that Vann was improperly excused because he said he was not opposed to the death penalty and in the right case would consider imposing it. A thorough reading of the transcript shows that Vann did not understand what was being asked. Initially he said he was not personally opposed to the death penalty but could not consider imposing it as a juror. Later he agreed he would have preconceived notions of appropriate punishment but admitted he did not know what that phrase meant; that he could consider all punishments but his mind was closed; and that he didn't believe in the death penalty. Finally it became clear he had misunderstood the previous questions, hearing the word "oppose" for the asked word "impose". The record clearly reflects that Vann did not believe in and would not impose the death penalty, and his excusal for cause was not an abuse of discretion.

■ Cannon next claims that the trial court erred in refusing to excuse venireman Hooks for cause. A criminal defendant has a right to remove for cause any juror who would automatically vote for the death penalty on conviction regardless of mitigating evidence.[23] When defense counsel asked whether Hooks would automatically vote for the death penalty, he said "Well, yes, I would." After Hooks repeated his answer, the trial court questioned him. The trial court summarized Hooks' answer, then used a civil case analogy to explain why it was important to determine in voir dire whether Hooks would be a proper juror in the event the trial reached the second stage. Cannon complains this explanation told Hooks that if he refused to consider other punishments he would not be allowed on the jury, in effect instructing Hooks to say he could consider all the alternatives despite his beliefs. Read in context, the trial court clearly tried to avoid the problems inherent in raising punishment issues before conviction, to emphasize that Cannon was innocent until proven guilty and to explain that the court had to ask these questions now because there would be no opportunity later. In no sense did the court direct Hooks' subsequent responses.

■ Hooks confirmed that he could fairly and equally consider all three punishments based on the evidence, and stated that his mind would not be made up until he heard the evidence. He then said that he would have a preconceived notion in favor of the death penalty. The trial court rephrased the question, defined "preconceived notion", stressed that this would be before any aggravating or mitigating evidence on punishment was presented, and engaged in the following exchange:

Court: [A]re you telling the Court that you would have a preconceived notion as to what the sentence would be?

Hooks: No, sir.

Court: You would have already made up your mind before you heard the evidence, in other words?

18. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

19. *Walker v. State*, 723 P.2d 273 (Okl.Cr.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986); *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

20. *Walker*, 723 P.2d at 281.

21. *Walker*, 723 P.2d at 281; *Dutton v. State*, 674 P.2d 1134 (Okl.Cr.1984); *Banks v. State*, 701 P.2d 418 (Okl.Cr.1985).

22. *Smith v. State*, 727 P.2d 1366, 1370 (Okl.Cr. 1986), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987); *Banks*, 701 P.2d at 423.

23. *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Ross v. State*, 717 P.2d 117, 120 (Okl.Cr.1986), *aff'd, Ross v. Oklahoma* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

Hooks: No, sir. . . .

Court: [D]o you believe that death is the only appropriate punishment?

Hooks: No, sir. . . .

Court: If you found the defendant guilty beyond a reasonable doubt of murder in the first degree, would you automatically vote to impose the death penalty no matter what the facts are?

Hooks: I—. . . . I would say no. . . .

Court: [In an intentional killing] could you fairly consider anything but death as a punishment?

Hooks: Yes.

Court: You could?

Hooks: Yes.

Court: Would it be difficult for you?

Hooks: No. No.

Although a cursory reading of the examination might suggest Hooks was unfit to sit on the jury, read as a whole this colloquy supports the finding that Hooks would not automatically impose the death penalty. Cannon complains that, after the first response, Hooks should have been excused for cause and the trial court should not have engaged in any rehabilitative effort. The trial court was able to observe Hooks as he answered and evidently was unconvinced by his initial response. This Court will not substitute its judgment for that of the trial court when determining if more questioning was necessary to confirm whether Hooks' views on the death penalty disqualified him as a juror. The trial court did not abuse its discretion in continuing to question Hooks and refusing to remove him for cause.

▇▇▇▇ Cannon finally complains that the trial court erred in refusing to grant Cannon additional peremptory challenges when he used one of his nine challenges to remove

Hooks. Cannon's argument here must fail because the trial court did not err in refusing to remove Hooks for cause. Cannon made a record after voir dire closed, requesting additional peremptories and naming two jurors he would challenge if granted additional peremptories. Cannon has thus preserved the issue for appeal.[24] Oklahoma law clearly provides that a defendant is entitled to nine peremptory challenges in a capital trial.[25] Had the trial court erred in refusing to excuse Hooks for cause, Cannon's requested remedy would have been unavailable. This subproposition is without merit.

## ISSUES RELATING TO GUILT AND INNOCENCE

Cannon claims that this Court's ruling reversing his 1986 convictions barred future prosecution because the decision was grounded in a finding that the permissible evidence supporting the convictions was insufficient for conviction, and Cannon's retrial thus violated double jeopardy. Cannon argues that this Court's opinion in *Cannon1*, while ostensibly a reversal and remand for separate trials, was actually a reversal based on insufficiency of the evidence, double jeopardy attached, and a retrial was barred. This Court rejected this argument when it was propounded by LaFevers.[26]

▇▇▇▇ In two propositions Cannon complains that first stage instructions on malice murder and aiding and abetting were so improper or misleading they created reversible error whether or not the evidence supported the crimes charged. Cannon did not object to any of the instructions at trial and waived all but plain error.[27] This Court will not disturb a verdict if instructions, taken as a whole, accurately state the applicable law.[28]

24. This Court has held a defendant cannot demonstrate prejudice where he has made no record of jurors he would challenge had he not used peremptories to challenge jurors not removed by the court. *Tibbs v. State,* 819 P.2d 1372, 1378 (Okl.Cr.1991); *Ross,* 717 P.2d at 120; *Ross v. Oklahoma,* 487 U.S. at 89–90, 108 S.Ct. at 2279. Had there been error in the trial court's refusal to excuse Hooks, Cannon's record would support his claim of prejudice.

25. 22 O.S.1991, § 655.

26. *LaFevers2,* 897 P.2d at 302.

27. *Kamees v. State,* 815 P.2d 1204, 1206 (Okl.Cr. 1991); *Ashinsky v. State,* 780 P.2d 201, 206 (Okl. Cr.1989).

28. *McGregor,* 885 P.2d at 1383; *Garcia v. State,* 734 P.2d 820 (Okl.Cr.1987).

In Proposition II Cannon argues that the aiding and abetting instructions allowed him to be convicted of malice aforethought murder without any showing that he intended Ms. Hawley be killed. Cannon was charged with malice murder and felony murder, rape, in the alternative. The verdict forms clearly show that Cannon was convicted of malice murder. The State's theory at trial was that Cannon was guilty of malice murder as a principal by aiding and abetting LaFevers (if the jury believed Cannon's statement) and also as a principal by his own actions. Title 21 O.S.1981, § 701.7(A), defines malice as the deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Cannon argues that instructing on aiding and abetting negated the element of specific intent to kill and allowed the jury to convict Cannon of malice murder if he had a general criminal intent. Cannon claims that the aiding and abetting instructions allowed the jury to convict him if they found he had the intent to commit any crime. Cannon and the State agree that proof of criminal intent is an essential element for a murder conviction under an aiding and abetting theory. Nobody contests the fact that, under the aiding and abetting theory, the jury had to find that Cannon was a principal to the crime. Instructions 36 and 37 correctly defined "principal" and aiding and abetting.[29] The remaining instructions clearly set forth the defense of abandonment, the burden of proof, and the definition of criminal intent.

 Cannon claims that the malice murder instructions told the jury that Cannon must have caused the victim's death and that the aiding and abetting instructions told them Cannon could be guilty if he did not actually commit the acts. He says "it is not a giant leap" to conclude that an aiding and abetting conviction for malice murder required only general intent. On the contrary, this is a leap of epic proportions. The aiding and abetting instructions cannot be read in a vacuum; they explicitly refer to the underlying charged crime and indicate that the elements of the charged offense must be proved. Read as a whole, the instructions clearly required the jury to find that Cannon's conduct caused Hawley's death and that he intended to take her life, or that he aided and abetted LaFevers' acts knowing of and sharing in LaFevers' intent to take Hawley's life. These instructions were not erroneous.

In Proposition IV Cannon complains of Instruction 17, which states that no person may be convicted of first degree murder unless his conduct or the conduct of another person for which he is criminally responsible caused the victim's death, and that the conduct must be "a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life."[30] Cannon argues that this instruction was unnecessary and confusing since he never disputed the cause of death, but denied killing Hawley or aiding and abetting LaFevers in her death. He claims that the jury might have viewed this as simply a third alternative, along with malice and felony murder, to support a conviction based on his generally threatening and dangerous conduct at Hawley's house (burglary, robbery and kidnapping). This argument mischaracterizes the language of the instruction.

Cannon correctly notes that the OUJI commission recommends the instruction in cases in which there is a dispute over whether a defendant's conduct or an intervening agency caused a victim's death, and advises that it not be given in cases where the defendant does not dispute the cause of death but claims he did not commit the crime. Where the defendant was the sole perpetrator of the crime this Court has held the instruction was not an abuse of discretion where the jury was also instructed that, as an element of malice murder, they must find the defendant caused the victim's death.[31] In a subsequent case, the instruction was error where the defendant did not dispute the cause of death but

---

**29.** *Fritz v. State,* 730 P.2d 535, 537 (Okl.Cr.1986).

**30.** OUJI–CR 426.

**31.** *Sellers v. State,* 809 P.2d 676 (Okl.Cr.), *cert. denied,* 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991).

claimed he did not kill the victim.[32] That error was harmless because the defendant did not object at trial and because the evidence that he drank with the perpetrator and participated in a related burglary would not confuse the jury into believing that conduct alone warranted a conviction for first degree murder.

Evidence showed Cannon, by his own admission, drank with LaFevers and participated in the burglary, robbery, and kidnapping. Arguing that the jury could have found this conduct sufficient, Cannon recasts the instruction's definition of causation as "threatening or dangerous to life", and suggests the instruction states that if conduct was "a substantial factor" in bringing about Hawley's death, no intent was required. This is simply not what the instruction says. The evidence of Cannon's participation in the lesser crimes did not show conduct which was "a substantial factor in bringing about the death and [was] dangerous and threatens or destroys life."

Case law suggests giving Instruction 17 may have been error which neither went to the foundation of the case nor affected Cannon's substantial rights. As in *Sadler*, the facts of this case render any error harmless. As in *Sellers*, the jury instructions taken as a whole accurately state the applicable law. We do not find plain error, and this proposition is denied.

 Cannon argues in Proposition V that the evidence was insufficient to prove he was a principal to the crimes charged, even as an aider and abettor. This Court will not disturb a conviction where, reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[33] We will accept reasonable inferences and credibility choices that tend to support the trier of fact.[34] In an aiding and abetting case, we will not disturb a verdict where evidence supports the jury's findings.[35] Cannon correctly notes that, to be convicted as a principal, he must either have committed the crimes or have aided and abetted them by procuring, aiding, assisting, advising, or encouraging their commission, by gestures, words, or acts.[36] Only slight participation is needed to change a person's status from mere spectator to aider and abettor.[37]

In his written statement and taped confession Cannon admitted:

— On June 24, 1985, he and Loyd LaFevers were together drinking at the Check Mate Club. They left the club with a friend, Roy Goolsby. LaFevers was driving his Camaro. LaFevers wrecked his car somewhere around 10th and Meridian or Portland, and drove it to a side street in a residential area. The three abandoned the car and Goolsby left.

— Cannon went with LaFevers to steal a vehicle.

— Cannon and LaFevers went to Hawley's house. LaFevers kicked or beat on the door. When Hawley refused to let them in LaFevers broke the glass and tried to kick in the door.

— Cannon went with LaFevers to the backyard. Hawley was getting away through the yard. LaFevers caught Hawley and took her inside.

**32.** *Sadler v. State,* 846 P.2d 377 (Okl.Cr.1993).

**33.** *Spuehler v. State,* 709 P.2d 202, 203–204 (Okl. Cr.1985).

**34.** *Maxwell v. State,* 742 P.2d 1165, 1169 (Okl.Cr. 1987).

**35.** *Hackney v. State,* 874 P.2d 810, 814 (Okl.Cr. 1994).

**36.** *McBrain v. State,* 763 P.2d 121, 124 (Okl.Cr. 1988); *Anglin v. State,* 92 Okla.Crim. 430, 224 P.2d 272 (1950).

**37.** *Hackney,* 874 P.2d at 814 (co-defendants testified that Hackney ordered them to kill victim and one co-defendant stabbed victim); *McBrain,* 763 P.2d at 124–125 (McBrain talked about finding girls, drove victim to scene knowing co-defendants intended rape while victim was screaming, watched co-defendants rape victim, gave false name to officers); *Sartin v. State,* 637 P.2d 897, 899 (Okl.Cr.1981) (Sartin warned co-defendant victim was armed, entered victim's home, yanked out phone cord, fled, disposed of weapon, and had bullets in purse); *Smith v. State,* 640 P.2d 988 (Okl.Cr.1982) (Smith held gun on victim from distance while co-defendant approached, entered victim's home, pointed out items to steal).

— Cannon entered Hawley's house and began looking for money. He heard LaFevers strike her and ask for money.

— Cannon brought LaFevers Hawley's purse with her garage door opener.

— Cannon started Hawley's Buick while LaFevers dragged her to the car and put her in the back seat. LaFevers got in the front seat as Cannon drove away.

— Hawley fell from the car and Cannon drove away from the house. *Cannon returned to the scene to get Hawley at LaFevers' direction because, LaFevers said, "she saw us."* Cannon drove off with LaFevers in the front and Hawley screaming "don't do it" in the back seat. LaFevers said they "had to get rid of her".

— Cannon pulled over and LaFevers put Hawley in the trunk. At LaFevers' direction, he stopped at a convenience store and LaFevers filled a 2–liter soda bottle with gas.

— Eventually Cannon pulled over and LaFevers took Hawley out of the trunk.

— LaFevers told Cannon he would have sex with Hawley. Cannon watched LaFevers rape her.

— Cannon watched LaFevers drag Hawley into the field. *LaFevers again said "she saw us."* LaFevers got the bottle of gas from the car.

— Cannon watched LaFevers pour gasoline over Hawley. Cannon refused to throw a lighted match on her, but he watched LaFevers light a match and set Hawley afire. The two watched as Hawley burned.

— Cannon drove Hawley's car a short distance. LaFevers put a gas-soaked rag in the gas tank outlet, poured gas on the car, and set it on fire. Both defendants ran away.

Other evidence connecting Cannon to the crimes included:

— Hawley's neighbor Ryan saw a man greatly resembling Cannon drag Hawley from the house to her car, saying "No, you're going with us", while a brown-haired man drove her car.

— Near the scene where Hawley was burned, witness Gaither saw a blond-haired man with a bandanna in the driver's seat of Hawley's Buick while a brown-haired man stood at the back on the passenger side. After he passed, he saw the blond-haired man standing next to the other man behind the car. He saw a gas can by the passenger side behind the trunk. He later heard an explosion and saw the same car on fire in a different location in the same general area.

— At the scene where the car was burned, witness Baker saw a blond man with a bandanna pouring something around and on the car from a gas can, and a dark-haired man standing nearby looking around. She saw the two men run from the scene. Shortly afterwards she heard a "boom" and saw the car (later identified as Hawley's) burning.

— At the scene of the car, witness Collins saw a blond-headed man walking around the car with a gas can and a brown-headed man she identified as LaFevers putting a rag in the gas tank outlet. Shortly afterwards she heard an explosion and saw the car burning.

— Parkey, manager of the Check Mate club, confirmed that Cannon usually wore his hair long with a bandanna. After the crime, she saw Cannon when he returned to the club. She wiped singed hair and blood from Cannon's arm and saw raised skin on his arm that appeared to be a burn.

— Goolsby agreed he, Cannon, and LaFevers wrecked and abandoned LaFevers' Camaro. Goolsby saw Cannon afterwards and noted that the hair on his arms was singed and he smelled like burned hair.

— Forensic examination revealed blood spatter, some of it consistent with Hawley's blood, on Cannon's shirt and jeans.

▮ Cannon's statement alone provides sufficient evidence to convict him of malice murder and arson.[38] The jury could infer malice aforethought and encouragement or assistance of LaFevers' actions from Cannon's admission that he returned for Hawley

---

**38.** See Proposition VI for discussion of the sex offenses.

after she escaped because "she saw us" and that they "had to get rid of her" (LaFevers made these statements, but Cannon acted on them). If the jury had any doubt as to Cannon's knowledge of LaFevers' intent, it should have been dispelled when Cannon said he watched LaFevers drag Hawley into a field, again heard LaFevers say "she saw us", and watched him get the gas and pour it on Hawley. Cannon's protest that he didn't know what LaFevers meant to do and didn't intend the result is incredible. Of course, other evidence suggests Cannon participated directly in the crimes. Cannon's suggestion that the evidence shows at most that he was present during the crimes is untenable. Sufficient evidence was present for the jury to find the essential elements of both malice murder and third degree arson.

 In Proposition VI Cannon correctly claims that his rape and sodomy convictions must be reversed with instructions to dismiss. Cannon alleges that the State failed to prove the corpus delicti of the crimes charged independent of Cannon's statement.[39] This Court is compelled to reverse because, even with Cannon's statement, there is simply not sufficient evidence of the elements of either rape or sodomy to sustain a conviction. Cannon's statements provide the only evidence of the rape and anal sodomy and indicate that at most Cannon must have been convicted of aiding and abetting these actions. Cannon said LaFevers said he would have sex with Hawley, and that he, Cannon, saw LaFevers have sex with Hawley while she lay face up, then turn her over. There was no trauma to Hawley's vaginal or rectal areas (those areas were not burned). Neither the medical examiner nor the forensic expert found semen or sperm on the body. Cannon stated that, from a distance in poor lighting, he saw LaFevers commit the acts, but he did not confirm the intimate details of the crimes. Penetration is an essential element of these offenses, and the evidence simply does not support the conclusion that either offense was committed. It is axiomatic that proof of each element of a crime must be introduced in order to sustain a conviction.[40]

 The State claims as independent corroborating evidence, first, that Hawley was found nude. This alone cannot serve as corroboration for any sexual assault charge; it only corroborates Cannon's statement that, by the time of the rape, Hawley's clothes were gone. Cannon did not recall when or how that occurred. A pair of loose green pants was found at the side of the road near where Cannon says the attack took place. The pants were bloody and one leg was inside out. The State emphasizes this evidence and claims the pants corroborate the sexual assault, as they were unburned and appeared to have been removed hastily. Even if this very weak evidence could possibly support any sexual assault charge, no independent evidence connects those pants to Hawley. On the tape, Cannon says Hawley was wearing a "green nightgown" thing (he is vague). He does not identify those pants as being hers. Even if one interprets the "green nightgown" statement to identify those green pants as Hawley's clothing, this evidence cannot corroborate the sex offenses, because: (1) Cannon's statement ("green nightgown") cannot be used to (2) connect evidence (green pants at scene) to the victim, which is then used as independent evidence to (3) corroborate Cannon's statement that the offenses occurred. By this reasoning, the Court would be using Cannon's statement as independent evidence to corroborate his statement. Even if we were to indulge in these gymnastics, Cannon's statement that he saw LaFevers have sex, without being able to confirm what actually occurred, is not enough in the absence of any other evidence to support these convictions.

 There is not sufficient evidence to support Cannon's rape and anal sodomy convictions, and they must be reversed with instructions to dismiss. This Court has carefully considered the effect of this decision on

---

**39.** A confession may be considered competent to support a conviction if it is trustworthy, i.e., corroborated by substantial, independent evidence. *Fontenot v. State,* 881 P.2d 69, 80 (Okl. Cr.1994).

**40.** *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

the other convictions in this case. As this evidence would have been properly admitted as part of the res gestae of the crime in any case, reversal of these convictions does not affect the convictions for murder and arson. We have also carefully considered whether these reversals affect the jury's imposition of the death penalty, and have concluded that the evidence was sufficient to support the aggravating circumstances in the absence of these convictions. We find that dismissal of Cannon's convictions for rape and anal sodomy does not require reversal or modification of Cannon's convictions for murder and arson or his sentence of death.

In Proposition VII Cannon complains that the medical and forensic expert testimony concerning the import of the lack of rape evidence improperly invaded the province of the jury, was irrelevant to the case, and was so prejudicial it outweighed any probative value. The medical examiner, Dr. Balding, testified on direct examination that "[i]n my experience it's usually the rule that you don't find any trauma in cases of sexual assault." Cannon objected neither to this nor the subsequent question and answer:

Q: "[I]s it your experience that if they've been sexually assaulted you're always going to find the presence of semen or sperm in a vaginal canal?"

A: "No, sir. One doesn't necessarily fall from the other."

The forensic expert, Joyce Gilchrist, was asked whether in her experience she always found semen in vaginal or anal swabbings in a rape case, and responded over objection:

A: "No." .... "First of all, and most frequently, we find in our evidence that the sexual act is not completed, therefore there is no semen ejaculated, nothing left behind. Or it could be that the victim had showered, changed clothes and an amount of time had passed by such that there will be nothing found. Or it could be that the

individual had a low sperm count and you would find little, if any, sperm cells behind."

 Cannon unaccountably claims that this testimony was beyond the scope of each witness's expertise. Cannon asserts that since no physical evidence had been found in the cases the experts referred to, they relied on personal opinions that rapes had occurred, they had no personal knowledge that the alleged rapes had actually occurred, and their expertise only went to reviewing physical evidence for the presence of indicia of rape. ·Admission of expert testimony is within the trial court's discretion, if such scientific, technical or other specialized knowledge will assist the trier of fact.[41] These opinions obviously assisted the trier of fact in determining the meaning of the evidence observed by· each expert, and each expert explicitly testified based on his or her experience.[42]

 Cannon argues in Proposition VIII that the trial court erred in failing to give the uniform "exculpatory statement" instruction, OUJI–CR–816. When the State introduces an exculpatory statement which, if true, would entitle the defendant to acquittal, he must be acquitted unless the statement has been disproved or shown to be false by other direct or circumstantial evidence in the case.[43] Cannon claims that the trial court erred in failing to give OUJI–CR–816 sua sponte after hearing the evidence of Cannon's statement regarding the sex offenses. As Cannon neither requested the instruction nor objected to the trial court's failure to give it this Court will review for plain error only.

Cannon claims that his statements "were clearly within the exculpatory statement rule" but does not say why. Cannon stated that LaFevers said he was going to have sex with Hawley, LaFevers took Hawley from the car and threw her on the ground, and

---

41. 12 O.S.1981, § 2702.

42. Cannon's reference to *McCarty v. State,* 765 P.2d 1215 (Okl.Cr.1988), is completely inapposite. The Court's comments in that case were directed toward opinions not expressed in this trial.

43. *Sadler,* 846 P.2d at 386; *Stiles v. State,* 829 P.2d 984 (Okl.Cr.1992); *Knott v. State,* 432 P.2d 128 (Okl.Cr.1967); *Mitchell v. State,* 408 P.2d 566 (Okl.Cr.1965). An exculpatory statement is one regarding a tangible factual matter capable of specific disproof which tends to clear a defendant from guilt or justify his actions.

Cannon saw him rape her. Even if one can construe this as a tangible, affirmative, factual matter capable of specific disproof, it does not exculpate Cannon from the charge of aiding and abetting the offenses. There is no error here.

In Proposition XI Cannon argues that the trial court erred in refusing to allow the jury during deliberations to review the audiotape of his statement (State Exhibit 110) which had been admitted and played at trial. During first stage deliberations the jury sent a note which asked if they could listen to the tape, and, if so, whether they could have a tape recorder. Over Cannon's objection the trial court refused the request as inappropriate.

▆▆▆▆ The question is whether State's Exhibit 110 is testimonial or non-testimonial in nature. If testimonial, the trial court is required to follow certain procedures before granting or denying the request.[44] If the exhibit is non-testimonial, the trial court has discretion to allow it into deliberations like any other exhibit.[45] This exhibit is clearly non-testimonial. It was a statement obtained from the defendant during the course of an investigation admitted into evidence at trial, but NOT a representation of the testimony of a witness at trial.[46] Cannon's audiotaped confession was not trial testimony, and the trial court did not abuse its discretion in refusing to allow it to be replayed in deliberations.

## ISSUES RELATING TO PUNISHMENT

▆▆▆ Cannon raises six issues related exclusively to the second stage of his trial. Under Oklahoma law, the death penalty may be imposed only if certain limited aggravating circumstances are found. Unless a murder, or the person who committed the murder, falls within one or more of the carefully circumscribed statutory aggravating circumstances, the death penalty may not be considered among the possible sentencing options. In Cannon's case, the State alleged and the jury found three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) there was a probability that Cannon would commit criminal acts of violence that would constitute a continuing threat to society; and (3) the murder was for the purpose of avoiding arrest or prosecution.

In Proposition III Cannon argues that his death sentence is invalid because the State failed to prove that Cannon intended that the victim be killed and the trial court failed to instruct the jury to make findings in accordance with *Enmund v. Florida*[47] or *Tison v. Arizona.*[48] Cannon argues that the jury instructions allowed him to be convicted without proof beyond a reasonable doubt that he intended Hawley's death. This, he says, violates the requirement that the sentencer in a capital case find individual culpability and intent for each defendant. Cannon admits that *Enmund* and *Tison* concern felony murder prosecutions where each defendant may have a different intent and degree of participation in the crime, and acknowledges that he, Cannon, was convicted of malice murder. He nevertheless says that the *Enmund/Tison* principles should apply in malice murder cases where the State presents an aiding and

**44.** *Pfaff v. State*, 830 P.2d 193, 195 (Okl.Cr. 1992); *Duvall v. State*, 780 P.2d 1178 (Okl.Cr. 1989); *Martin v. State*, 747 P.2d 316, 320 (Okl. Cr.1987). If an exhibit is testimonial, the trial court must call the jury and parties into open court and determine (1) the exact nature of the jury difficulty; (2) if the court can isolate the precise testimony which will solve the jury question; and (3) whether the probative value of replaying testimony outweighs the possibility of undue emphasis on the testimony. After these factors are considered, the trial court may repeat some testimonial exhibits in open court or in a similarly controlled environment. *Pfaff*, 830 P.2d at 195.

**45.** *Pfaff*, 830 P.2d at 195; *Duvall*, 780 P.2d at 1180.

**46.** *Lambert v. State*, 888 P.2d 494, 506 (Okl.Cr. 1994); *Pfaff*, 830 P.2d at 195 (Judge Lumpkin, specially concurring).

**47.** 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

**48.** 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

abetting theory. Cannon makes no coherent argument to support this statement.[49]

Cannon did not request an *Enmund* instruction, and has waived all but plain error.[50] As discussed in Proposition II, the jury was adequately instructed regarding the necessity for a specific finding of malice before conviction for malice murder. Any *Enmund* instruction in the second stage would erroneously require the jury to reexamine their finding of guilt; this jury was properly instructed and had to assume that intent was an established fact during the second stage proceedings.[51]

In Proposition XII, Cannon attacks all three aggravating circumstances found by the jury. Cannon claims that Oklahoma's "continuing threat to society", "heinous, atrocious, or cruel", and "murder to avoid arrest or prosecution" aggravating circumstances are unconstitutionally vague and overly broad on their face and as construed by this Court. Cannon did not object to the instructions at trial and has thus waived all but plain error. There was no error in these instructions.

In Subpart A Cannon claims that the "continuing threat" aggravating circumstance is unconstitutionally vague on its face. Cannon acknowledges that this circumstance has been held to be specific, not vague, and readily understandable,[52] but argues that this holding was in error. This Court recently narrowed the standards for this aggravating circumstance and has consistently rejected this argument in a variety of cases Cannon urges the Court to reconsider.[53] Cannon offers us no reason to reconsider these decisions.

In Subpart B Cannon addresses the aggravating circumstance that the murder was especially heinous, atrocious or cruel. The jury was given the standard instruction (OUJI–CR 436) limiting the use of this aggravating circumstance to cases in which the death was preceded by torture or serious physical abuse. This aggravating circumstance is valid when this limiting construction is applied.[54] Cannon argues that paragraphs one and two of this instruction inherently conflict. We disagree. Paragraph one of the instruction defines the terms "heinous", "atrocious" and "cruel". Paragraph two tells the jury the situations in which those terms may be applied. Cannon is also mistaken in supposing this Court has added conscious suffering as a separate element of the aggravating circumstance. This Court has held that a victim must be conscious in order to

---

**49.** He cites Judge Lumpkin's dissent in *Lafevers1*, which, discussing mutually antagonistic defenses, distinguished between exculpation as to innocence and exculpation regarding levels of culpability. Judge Lumpkin found that the defenses went only to culpability, so would have determined whether the evidence at trial supported the jury's finding that both defendants were principals in the crimes and knew the killing would take place, knew lethal force would be used, killed, or attempted to kill, as required by *Enmund*. This analysis is specifically tied to the determination that the defenses went to culpability only, and does not support Cannon's argument here. *Lafevers1*, 819 P.2d at 1371.

**50.** Cannon did move during the second stage to strike the Bill of Particulars as not providing evidence of his intent under *Enmund*. This motion was overruled.

**51.** *Mann v. State*, 749 P.2d 1151, 1161 (Okl.Cr.), *cert. denied*, 488 U.S. 877, 109 S.Ct. 193, 102 L.Ed.2d 163 (1988).

**52.** See, e.g., *Boyd v. State*, 839 P.2d 1363, 1371 (Okl.Cr.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993).

**53.** *Malone v. State*, 876 P.2d 707, 717 (Okl.Cr. 1994); *Mitchell v. State*, 884 P.2d 1186, 1208 (Okl.Cr.1994); *Hogan v. State*, 877 P.2d 1157, 1162 (Okl.Cr.1994); *Snow v. State*, 876 P.2d 291, 298 (Okl.Cr.1994); *Revilla v. State*, 877 P.2d 1143, 1153 (Okl.Cr.), *cert. denied*, —— U.S. ——, 115 S.Ct. 764, 130 L.Ed.2d 661 (1994); *Ellis v. State*, 867 P.2d 1289, 1301 (Okl.Cr.1992) *cert. denied*, —— U.S. ——, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994); *Trice v. State*, 853 P.2d 203, 220–221 (Okl.Cr.), *cert. denied*, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Pickens v. State*, 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

**54.** See, e.g., *Stouffer v. State*, 742 P.2d 562 (Okl. Cr.1987) (Opinion on Rehearing), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Clayton v. State*, 840 P.2d 18, 28 (Okl.Cr. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *Stafford v. State*, 832 P.2d 20 (Okl.Cr.1992); *Rojem v. State*, 753 P.2d 359 (Okl.Cr.), *cert. denied*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988); *United States v. Kelly*, 1 F.3d 1137, 1143 (10th Cir.1993); *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

suffer torture or serious physical abuse, but this is not a separate element on which the jury must be instructed.[55] Finally, Cannon claims that every homicide involves injuries which may be characterized as "serious physical abuse". This Court has approved the "serious physical abuse" construction, but disapproved the phrase "serious physical harm" following the reasoning Cannon employs.[56] This instruction was proper.[57]

In Subpart 3 Cannon attacks the aggravating circumstance that the murder was committed to avoid a lawful arrest or prosecution. Cannon claims that this aggravating circumstance is subjective and undefined. He complains that anyone accused of murdering a potential witness to a previous felony is subject to the death penalty if evidence shows the defendant made any attempt to conceal his identity. Cannon inexplicably ignores controlling authority which requires a predicate crime separate from the murder for which a defendant seeks to avoid arrest.[58] This circumstance is neither subjective nor standardless.

■■■ To summarize, the three aggravating circumstances found in this case are constitutional. Evidence supports the jury's finding that the murder was especially heinous, atrocious or cruel.

In Proposition XIII Cannon argues that the evidence was insufficient to warrant a finding of continuing threat beyond a reasonable doubt. Cannon provides an excellent precis of this Court's death penalty jurisprudence. He notes that the most common

grounds for this aggravating circumstance include a history of violent conduct (including adjudicated and unadjudicated offenses),[59] the facts of the homicide of which the defendant was convicted,[60] and other grounds including threats, lack of remorse, attempts to prevent calls for help, testimony of experts, and mistreatment of family members.

■■■ Cannon does not appear to have a prior history of violent crime (his misdemeanor warrant stemmed from a conviction for driving under the influence). The State argues, first, that the facts of the murder alone support this circumstance. Also supporting the finding is Cannon's escapade at the Paden household the same night as the Hawley murder. After leaving the Check Mate at closing, LaFevers and Cannon went to Anna Paden's home. Anna, in her eighties, lived with her teenage granddaughter Tammy. Cannon and LaFevers broke into the house and entered a bedroom although Tammy was shooting at them. They got the gun away from Tammy, beat her and Anna, may have attempted some form of sexual assault on Tammy, dragged Tammy from the house and tried to kidnap her before leaving. They took the gun, which was found in Cannon's house at his arrest. Tammy was badly beaten about the face. Both women testified in the second stage; neither could identify Cannon but Tammy had identified LaFevers previously and her testimony indicated that Cannon was her main assailant (defense counsel tried valiantly but unsuccessfully to challenge this identification). Cannon had pled to charges arising from this incident

---

55. *Battenfield v. State*, 816 P.2d 555, 565 (Okl.Cr. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

56. *Pickens v. State*, 885 P.2d 678, 684 (Okl.Cr. 1994).

57. Cannon nowhere complains that insufficient evidence supports this aggravating circumstance. Evidence showed that Hawley was beaten in her home, robbed, kidnapped, kept in the trunk of her car, dragged from the car, beaten again, set on fire, moved 10 to 15 feet while burning, and lived for approximately five more hours. This circumstance is supported by ample evidence.

58. *Barnett v. State*, 853 P.2d 226, 233 (Okl.Cr. 1993); *Mitchell*, 884 P.2d at 1208; *McGregor*, 885 P.2d at 1385.

59. I have consistently disagreed with the use of unadjudicated offenses to support the continuing threat aggravating circumstance. *See, e.g., Paxton v. State*, 867 P.2d 1309 (Okl.Cr.1993).

60. This ground does not appear to withstand close analysis. No case in which the aggravator was upheld for this reason has attempted any sort of explanation as to why the facts of any particular crime, however gruesome or brutal, make it more likely that any defendant will commit future crimes, and it is difficult to fashion a convincing argument justifying such speculation or extrapolation from acts alone.

before this trial, but this plea was not communicated to the jury so technically they would have viewed this as evidence of unadjudicated crimes. This evidence not only shows contemporaneous and startlingly similar criminal acts, but casts doubt on Cannon's evidence that he was remorseful after the Hawley crimes. In addition, by Cannon's own statement, he picked up Hawley after she escaped to prevent her from calling for help. The Paden incident alone could support the jury's finding of this aggravating circumstance.

Cannon argues in Proposition XIV that there was insufficient evidence to support the finding that the murder was committed to avoid or prevent a lawful arrest or prosecution. Cannon again ignores this Court's controlling authority, citing instead several Florida cases. The State must present evidence showing beyond a reasonable doubt clearly separate predicate felonies for which Cannon sought to avoid detection.[61] This may require a determination of the defendant's state of mind, which may be inferred from circumstantial evidence.[62] Cannon said that LaFevers twice told him "she saw us" and once said they had to "get rid of her". These statements clearly referred to the predicate crimes of burglary and robbery. In addition, witness Ryan heard the blond man greatly resembling Cannon say to Hawley, "No, you're going with us" as she was dragged to her car. Cannon complains that virtually all felony murders will provide facts supporting this aggravating circumstance, and suggests that this evidence merely provides a theory of motive for the murder. Cannon's first complaint, if true, does not suggest that the circumstance is standardless or overly broad. If carried to its logical conclusion, his second complaint would preclude the State from ever charging more than one aggravating circumstance per crime, as each circumstance must be presented as a potential theory of the case with supporting evidence. Sufficient evidence existed to support the jury's finding of this aggravating circumstance.

Cannon claims in Proposition XVI that his death sentence was imposed under the influence of passion, prejudice, and other arbitrary factors. After a lengthy discussion of the qualitative difference in punishment and corresponding meticulous standard required in capital cases, Cannon specifically complains of a very few items he says resulted in an arbitrary sentence.

During second stage closing argument the State told the jury that, just like the investigating and arresting officers, the State, defense counsel and the trial court, the jury was here to do its duty to decide the case. Cannon claims this was an attempt to minimize the jury's responsibility. While it would be error if the State had counted up the amount of time each person spent doing his "duty", this Court has held the State may note that everybody involved has a special role in the proceedings.[63] Elsewhere in argument, the State emphasized that the jury would be authorized to consider the death penalty, not required to impose it, and that it would be their decision. This argument was not error and the comments did not induce an arbitrary sentence.

Cannon complains that several first stage errors also support this proposition. He first argues that voir dire irregularities amounted to an arbitrary abuse of discretion and injected arbitrary factors into the death sentence. Cannon's voir dire claims are discussed in Proposition XVI and the record does not support this assertion. Cannon claims that the use of illegally obtained evidence injected an arbitrary factor in the proceedings. As discussed in Propositions IX and X, all the evidence was legally obtained and this charge must fail. Cannon recharacterizes his arguments in Propositions II, III, and IV as stating that those respective first stage in-

---

61. *Barnett,* 853 P.2d at 233.

62. *McGregor,* 885 P.2d at 1385; *Rojem,* 753 P.2d at 368; *Smith v. State,* 737 P.2d 1206, 1216 (Okl.Cr.), *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); *Eddings v. State,* 616 P.2d 1159, 1169 (Okl.Cr.1980), *reversed in part on other grounds,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

63. *Woodruff v. State,* 846 P.2d 1124, 1140 (Okl. Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

structions lowered the State's burden of proof. These arguments were also without merit. Finally he points to the trial judge's refusal to allow the tape of Cannon's confession to be replayed during first stage deliberations. As discussed in Proposition XI, this was not error. As none of Cannon's claims constituted error, his claim that, individually and cumulatively, they injected arbitrary factors into the trial must fail.

## MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.Supp. 1985, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances.

Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C).

The jury was instructed on and found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) there was a probability that Cannon would commit criminal acts of violence that would constitute a continuing threat to society; and (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.

The Judgments and Sentences of the District Court of Oklahoma County for First Degree Murder and Third Degree Arson are **AFFIRMED.** The Judgments and Sentences of the District Court of Oklahoma County for First Degree Rape and Forcible Anal Sodomy are **REVERSED** with instructions to **DISMISS.**

LANE and STRUBHAR, JJ., concur.

LUMPKIN, J., concurs in result.

JOHNSON, P.J., concurs in part and dissents in part.

LUMPKIN, Judge, concurring in result.

I concur in the result reached in this case, and generally concur in the analysis presented. However, I am concerned with dicta and comments spread throughout which have no place in a published opinion. I shall address them in the order they are presented.

I agree we should address the subject of what Appellant perceives as an illegal arrest; however, I do not necessarily agree with statements presented in footnote 6. While I always admire the insightful analysis of my colleague, I do not agree with the tendency to insert in footnotes statements which should be in the body of the opinion. While there are exceptions, statements in footnotes are generally regarded as dicta, having no precedential value. *See Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985) (In determining statements in footnote to be dicta, Court notes it had on other occasions rejected language from a footnote as "not controlling."); *McDaniel v. Sanchez,* 452 U.S. 130, 141–42, 101 S.Ct. 2224, 2231–32, 68 L.Ed.2d 724 (1981); *Henderson v. Morgan,* 426 U.S. 637, 651, 96 S.Ct. 2253, 2260, 49 L.Ed.2d 108 (1976) (White, J., with whom Stewart, Blackmun, and Powell, JJ., join, concurring); *McCrary v. State,* 533 P.2d 629, 633 (Okl.Cr. 1974). Accordingly, I view the statements in footnote 6 as dicta.

Is the opinion overruling what is left of *Schorr v. State,* 499 P.2d 450 (Okl.Cr.1972) in footnote 13? I have no problem doing so in the body of the opinion; in fact, I would encourage it. The problem lies with the vague language surrounding the discussion of the case. If we are going to overrule it, let's explicitly do so.

The discussion dealing with consent to search is also less than clear. The issue is whether a consent to search is valid, not to whether a defendant had a right to a search warrant. I agree with the Court the consent to the search in this case was valid.

The opinion (at 98) ends the discussion of peremptory challenges with this enigmatic comment: "Had the trial court erred in refusing to excuse Hooks for cause, Cannon's requested remedy would have been unavail-

able." Is the opinion trying to say even if there was error by the court the statute does not allow the granting of more than nine peremptory challenges? It is not clear and I cannot accede to the comment as a holding in the case.

Perhaps the most volatile language in the opinion lies in footnote 60, discussing the use of the facts of the particular murder *sub judice* as the sole basis to support the continuing threat aggravating circumstance. Is the opinion attempting to overrule cases which previously have set out this holding? If the reasoning is faulty, we should in the body of the opinion discuss the legal reason why it is faulty and explicitly overrule cases so holding; if it is not faulty, there is no need in stirring up settled waters. Stare decisis dictates the analysis of this issue and the validity of the aggravator to the facts of this case. The dicta in this footnote serves no useful purpose except to be cited countless times by future appellants.

I am uncertain why there is a discussion (opinion at 107) regarding improper closing argument where the prosecution told the jury it was there to do its duty in deciding this case (just like the officers, the lawyers, and everyone else had). Appellant claimed this was an attempt to minimize the jury's responsibility. The opinion then states: "While it would be error if the State had counted up the amount of time each person spent doing his 'duty,' this Court has held...." This might be a correct statement, however, the prosecution *did not do* that in this case. Accordingly, the opinion is once again addressing an issue which is not before the Court. We have enough wood to saw which is in front of us; we need not look elsewhere for more. Appellate court opinions should adjudicate the issues before the court based on the facts in the case. It is through clear adjudication of the issues and analysis of the Court's holding that provides appropriate guidance to trial judges and practitioners. They should not have to guess at what we have decided and why.

Otherwise, I agree with the excellent analysis presented in the opinion.

JOHNSON, Presiding Judge, concurring in part and dissenting in part.

I would concur in the findings of the Court affirming the First Degree Murder and Third Degree Arson. I would dissent, however, from the reversal to dismiss the First Degree Rape and Forcible Anal Sodomy. I find that there was sufficient evidence to corroborate the appellant's statements as it relates to the two charges. I find that there was corroborating evidence of a green nightgown that was found where it was stated it would be found, that same was turned inside out as if it had been moved in a hurry. I would also find that there was corroborating evidence relative to the green nightgown, that appellant had stated she was wearing a green nightgown, and this should be enough to presume the pants were hers.

I also find that there was sufficient evidence of the anal sodomy. The forensic expert testified that no semen was found, but also this is common. You cannot presume that the person was not raped just due to the lack of semen. I agree the evidence was weak, but would uphold the jury's verdict.

## ORDER DENYING PETITION FOR REHEARING AND DIRECTING ISSUANCE OF MANDATE

Randall Eugene Cannon was tried by jury before the Honorable Thomas C. Smith in the District Court of Oklahoma County, in Case No. CRF–85–3254. He was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1981, § 701.7, Third Degree Arson in violation of 21 O.S.1981, § 1403(A), First Degree Rape in violation of 21 O.S.1981, § 1114, and Forcible Anal Sodomy in violation of 21 O.S.Supp.1982, § 888. At the conclusion of the first stage of trial, the jury returned a verdict of guilty. During sentencing, the jury found 1) the murder was especially heinous, atrocious, or cruel; 2) there was a probability that Cannon would commit criminal acts of violence that would constitute a continuing threat to society; and 3) the murder was for the purpose of avoiding arrest or prosecution. Cannon was sentenced to death for the murder conviction, ten years incarceration for arson, forty years for rape, and twenty years for sodomy.

By its September 8, 1995, published opinion, this Court affirmed Cannon's convictions and sentences for murder and arson, and reversed the convictions for rape and sodomy with instructions to dismiss.[1] Cannon is now before the Court on a Petition for Rehearing, Rule 3.14, *Rules of the Court of Criminal Appeals,* 22 O.S.Supp.1995, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall be filed for two reasons only:

(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument.

Cannon raises one proposition in his Petition for Rehearing which fails to meet the criteria set forth in Rule 3.14. Accordingly, this proposition will not be addressed.[2]

**IT IS THEREFORE THE ORDER OF THE COURT** that the Petition for Rehearing is **DENIED.** The Clerk of the Court is directed to issue the mandate forthwith.

**IT IS SO ORDERED.**

**WITNESS OUR HANDS AND THE SEAL OF THIS COURT** this 6th day of October, 1995.

/s/ Charles A. Johnson,
　　CHARLES A. JOHNSON
　　Presiding Judge

/s/ Charles S. Chapel,
　　CHARLES S. CHAPEL
　　Vice–Presiding Judge

/s/ Gary L. Lumpkin,
　　GARY L. LUMPKIN
　　Judge

/s/ James F. Lane,
　　JAMES F. LANE
　　Judge

1. *Cannon v. State,* 66 O.B.J. 2779 (Okl.Cr. September 8, 1995).

2. This Court determined beyond a reasonable doubt that Cannon's erroneous convictions for rape and sodomy did not contribute to the re-

/s/ Reta M. Strubhar,
　　RETA M. STRUBHAR
　　Judge

maining verdicts. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).